THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARGARET LEE, a/k/a Margaret Lee Garver, Defendant-Appellant.

Fifth District No. 5—87—0786

Opinion filed June 26, 1989.

422

Edward J. Kionka, of Murphysboro, Brocton Lockwood, of Marion, and William A. Schroeder, of Carbondale, for appellant.

Charles Grace, State's Attorney, of Murphysboro (Kenneth R. Boyle, Stephen E. Norris, and Ellen Eder Irish, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE CHAPMAN delivered the opinion of the court:

"And now abideth faith, hope, charity, these three; but the greatest of these is charity." 1 Corinthians 13:13.

"Of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive, for it affects his ability to assert any other rights he may have." (Schaefer, *Federalism & State Criminal Procedure*, 70 Harv. L. Rev. 1, 8 (1956).)

Two quotes from two men skilled in the law, separated by 2,000 years, but together in their recognition that there is a relative order of importance in cherished values. The source and wisdom of Paul's words are beyond both the scope and the authority of this opinion. The source of Justice Schaefer's words is obviously the sixth amendment, and their wisdom is the very subject of this opinion.

The legal questions before this court are: was Margaret Lee denied the effective assistance of counsel, and, if so, does that denial require reversal of her conviction? The answer to both of those questions is yes.

The sixth amendment establishes that those charged with a criminal offense in this country are entitled to certain rights:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence." (U.S. Const., amend. VI.)

The importance of the last mentioned of these rights, "the assistance of counsel for his defence," has been recognized not only by Justice Schaefer, but by the United States Supreme Court. "In an adversary system of criminal justice, there is no right more essential than the right to the assistance of counsel." (*Lakeside v. Oregon* (1978), 435 U.S. 333, 341, 55 L. Ed. 2d 319, 326, 98 S. Ct. 1091, 1096.) More explicitly, "[t]he right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in

the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence." *Powell v. Alabama* (1932), 287 U.S. 45, 68-69, 77 L. Ed. 158, 170, 53 S. Ct. 55, 64.

Why is the right to counsel so crucial? Precisely because we operate under an adversary system of law. A person charged with a crime has the might and the resources of the government arrayed against her; the prosecutor has little duty and less inclination to advise the person charged that she must be brought to trial within the time prescribed by statute and in the proper venue and before an impartial jury and so on. The lay defendant, who may have at least some rudimentary knowledge about her *Miranda* rights, generally has no knowledge whatsoever about the above-stated rights or about the right to have compulsory service issue or the right of confrontation. The sixth amendment rights are obviously not all of the constitutional safeguards enjoyed by an individual in our society, but the knowledge of those safeguards and, equally importantly, the knowledge of the means to insure that the person charged has the full benefit of them is peculiarly the knowledge of the lawyer. The right to counsel of an accused is as the right to see to the blind or the right to hear to the deaf. With counsel the accused should both see and hear all of her enumerated rights and enjoy their full protection; without counsel she has little chance of either seeing or hearing them, let alone enjoying their protection. This is not meant to be critical of the State for failing to fully inform all defendants of each and every right. In our adversarial system that is not the State's function; it is, however, the function, and duty, of counsel for the defense. This duty is the same whether counsel is appointed or retained (*Cuyler v. Sullivan* (1980), 446 U.S. 335, 64 L. Ed. 2d 333, 100 S. Ct. 1708; *People v. Corder* (1982), 103 Ill. App. 3d 434, 431 N.E.2d 701), and it cannot be fulfilled by merely ensuring that some lawyer is present or, as Justice Bazelon so succinctly put it, "the sixth amendment demands more than placing a warm body with a legal pedigree next to an indigent defendant." Bazelon, *The Realities of Gideon & Argersinger*, 64 Geo.

L.J. 811, 819 (1976).

■ Is competent counsel so important solely because of the rights of the accused? He would be if that were the only service that he afforded, but in reality defense counsel plays a dual role. His first duty is to protect the rights and liberties of his individual client. Second, by adequately performing his first duty, he enables our judicial system to function and to maintain its integrity as an institution. It is not only the rights of the single individual that are protected by a vigorous and effective defense, it is also the rights of each member of our society, for as Macaulay noted: "[T]he guilty are almost always the first to suffer those hardships which are afterward used as precedents against the innocent." (1 T. Macaulay, The History of England 440 (1885), quoted in *United States v. Barrett* (7th Cir. 1974), 505 F.2d 1091, 1115 (Stevens, J., dissenting).) Or to refer to a slightly more modern source, "[t]he fundamental nature of the right to counsel in the adversary· system makes effective assistance an indispensable predicate to institutional integrity." Note, *Identifying and Remedying Ineffective Assistance of Criminal Defense Counsel: A New Look After United States v. Decoster*, 93 Harv. L. Rev. 752, 767 (1980).

With these basic but important principles in mind we will turn to an examination of the facts of this case which result in our conclusion that the conviction must be reversed.

During the early morning hours of Saturday, January 15, 1983, a fire destroyed an entire city block in Murphysboro, Illinois, and a resident of one of the apartments died of smoke inhalation. On October 13, 1983, Roger Lee "Bubba" Ellis and Margaret Lee were charged with murder in that, while committing arson, they caused the death of Mr. Wayman.

Mr. Ellis had been charged earlier by the Federal authorities with the crime of arson. He went to trial on that charge in late October 1983. Although he had given a confession in January 1983, he denied confessing at trial and he was acquitted. The State murder charge against him was subsequently dismissed on double jeopardy grounds. He was granted immunity from any possible charge of perjury and testified in Margaret Lee's trial, which took place in January of 1986. Ellis testified that he had assisted Lee in starting the fire. She was convicted of murder and sentenced to 25 years in prison and a $2,500 fine. Her conviction was affirmed by an order of this court on direct appeal which was based on reasonable doubt grounds. She then filed a post-conviction petition which set forth as its sole basis the ineffective assistance of counsel. The trial court denied the petition and she appeals to this court.

█▌ ▌ As a preliminary matter the State contends that the defendant has waived the claim of ineffective assistance of counsel because she did not raise it either in her post-trial motion or on her direct appeal. We agree that the Post-Conviction Hearing Act (Act) (Ill. Rev. Stat. 1987, ch. 38, par. 122—1 *et seq.*) was not intended to be used as a means of obtaining further consideration of claims of denial of constitutional rights where a review of the issues raised has been held. (*People v. Weaver* (1970), 45 Ill. 2d 136, 137, 256 N.E.2d 816, 817.) Where an appeal is taken from a conviction, the judgment of the reviewing court is *res judicata* as to all issues actually raised, and those issues that could have been presented but were not are deemed waived. (*People v. Rooney* (1974), 16 Ill. App. 3d 901, 903, 307 N.E.2d 216, 218.) By its terms, the Post-Conviction Hearing Act affords only one opportunity to raise a constitutional claim: "Any claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived." (Ill. Rev. Stat. 1987, ch. 38, par. 122—3.) We are of the opinion, however, that defendant is not precluded from raising, by way of a petition under the Post-Conviction Hearing Act, constitutional questions which depended upon facts not found in the record. To hold otherwise would render the Act ineffectual. *People v. Thomas* (1967), 38 Ill. 2d 321, 322-23, 231 N.E.2d 436, 437.

█▌ In the instant case, although defendant on direct appeal had available to her some instances of incompetence of her trial counsel based on matters in the record, defendant has suggested herein that there are examples of counsel's incompetence which were outside the trial record and hence were not readily apparent on direct appeal. It is these aspects of trial counsel's ineffectiveness which defendant sought to have the court review by way of her petition. The waiver doctrine does not apply to issues raised in a post-conviction petition which stem from matters outside the record and which could not be brought on direct appeal. (*People v. Taylor* (1988), 165 Ill. App. 3d 1016, 1019, 520 N.E.2d 907, 910.) We conclude, therefore, that since the allegations contained in defendant's petition under the Act require an inquiry into certain matters outside the record, and since our decision in our order of July 2, 1987, was based only upon that record, the defendant's claim of ineffective assistance of counsel was not waived. In addition, to the extent that certain other matters could arguably have been raised on direct appeal, we conclude that fundamental fairness requires that we consider them in this case. *People v. Hamby* (1965), 32 Ill. 2d 291, 205 N.E.2d 456.

█▌ The leading case on ineffective assistance of counsel, *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct.

2052, first cautions against hypercritical second-guessing:

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to secondguess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " (*Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065.)

*Strickland* then sets forth the appropriate standard for review.

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." (*Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.)

Or, in other words, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) Or stated slightly differently, "[w]hen a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695, 80 L.

Ed. 2d at 698, 104 S. Ct. at 2068-69.

The Illinois Supreme Court adopted the *Strickland* test in *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061.

Before applying the *Strickland* standard to this case, we will set forth the pertinent factual background. In 1976, Charles Murphy and his wife, Marie, purchased a building in Murphysboro. Mr. Murphy operated a tavern, Murph's Place, on the ground floor and either lived in or rented out an upstairs apartment. In 1982, Mr. Murphy and his wife were divorced, and as a part of the divorce settlement his wife was to receive $26,000. Marie Murphy had worked in the tavern business during the marriage.

In 1982, Mr. Murphy and the defendant Margaret Lee began living together, at one point in an upstairs apartment and at the time of the fire in a house that she rented on Route 149 near Murphysboro. The defendant had no ownership interest in the building or tavern operation although she worked in the tavern on occasion.

Roger "Bubba" Ellis also worked part time in the tavern. He would come in in the morning to clean up and to ice the beer. He also occasionally waited on customers. While Mr. Ellis was apparently capable of taking orders and making change, it is clear that he is a young man with some severe disabilities. He has a significant speech impediment, and he is also mentally disabled.

In Mr. Ellis' Federal trial on the arson charge, the defense counsel called Dr. Cuneo. Dr. Cuneo holds a Ph.D. in clinical psychology, and his area of expertise is forensic clinical psychology. At the time of the trial he was the Director of Forensic Research at Chester Mental Health Center, which is the Illinois maximum security hospital, and he was also a consultant for the 20th Judicial Circuit. He did one to two evaluations a week, and the majority of times that he was called to testify, it was on the behalf of the prosecution. His testimony (again in the Federal court proceeding) disclosed that Mr. Ellis had a verbal IQ of 55, a performance IQ of 64, and a full-scale IQ range of 57, which placed him in the mildly mentally retarded range. He indicated that Mr. Ellis was functioning at the level of an eight- or nine-year-old child, that he could read at the second-grade level, and conduct math calculations at the 1.9-year level. He gave examples of his reading ability and testified that Mr. Ellis could not read words such as "was" or "then," and that while he could read words such as "him," "how," "heat," "open," "letter," and "jar," he could not read other words such as "deep," "even," "spell," or "awake." With regard to his mathematical ability, he again gave examples. When asked if you have

three pennies and you spend one, how many do you have left, Mr. Ellis answered two. However, when asked what is three plus four, he answered eight. In the written part of the test which asked the participant to add one and one, or four minus one, or four times two, he could do none of the operations. Dr. Cuneo further testified that an individual with an IQ of 57 is functioning in the bottom one percentile of the nation intellectually, which means that his social and intellectual abilities will be impaired, his reasoning ability will be impaired, his judgment will be impaired, and he is likely to fall apart more readily under stress. Dr. Cuneo also indicated that Mr. Ellis was receiving social security disability benefits because of his retardation and that the social security agency had determined that he could not handle his own funds and therefore he had to have a payee.

In addition to Dr. Cuneo's own testing, he had reviewed tests performed on Mr. Ellis by other psychologists. In June 1977, his test results placed him in the mildly mentally retarded range. Dr. Boyd tested him twice in September of 1976. One result was an IQ of 64, which would place him in the mildly mentally retarded range. The other test result of Dr. Boyd was an IQ of 44, which would have put him in the moderately mentally retarded range. Dr. O'Donnell tested him in July of 1976 and his result was an IQ of 56. The only IQ test which was significantly higher than the above-repeated test results was that of Dr. Bohn and his test result was an 82. Dr. Cuneo explained that Dr. Bohn had used a Beta test, which is a screening test that is normally given to several people at a time. Consequently, it is not as accurate as the tests conducted by Dr. Cuneo and the other authorities, which are administered on an individual basis.

Finally, Dr. Cuneo testified that he did not examine Mr. Ellis to determine either his competency to stand trial or his sanity. His examination was for other reasons, and as a result of them, he determined that Mr. Ellis was retarded, was a person who was easily led, was a person who would confess to almost anything if enough pressure were applied, and finally, that he was a person who would act as if he were able to answer questions when he in fact did not know the answers. In this latter regard, Dr. Cuneo gave examples of asking Mr. Ellis whether he knew what such and such meant, to which Mr. Ellis would reply yes, but then if asked to explain what it meant, the only thing that he could do was parrot back what he had been told by the examiner.

During the post-conviction hearing, Mr. Ellis testified that Wayne Saylor had fired him before the fire and that the firing had made him mad. At the same hearing Officer Curt Graff testified that Mr. Ellis

had been charged with arson on approximately six occasions, one of which involved a fire he set because he was mad at a man who underpaid him. Defense counsel was able to lead Mr. Ellis to state that the State's Attorney had asked him to lie on the stand. (There is absolutely no indication that there was any truth to this statement.)

After the fire of January 15, 1983, Mr. Ellis was first contacted by Officer Curt Graff of the Murphysboro police department on January 26, 1983. He was interviewed at the police station, after being given his *Miranda* warnings, although he was neither a suspect nor under arrest at the time. At that interview Mr. Ellis gave several versions of his activities on the morning of the fire. His first statement denied any involvement at all. When that statement was challenged, he changed it and indicated that he and Bobby Greenwell, another employee of Murph's Place, had started the fire. When the police challenged that story, he changed it and said that he and an unknown man had agreed to meet in the upstairs apartment. When the police challenged the third version, he changed it again and gave a fourth story. In the fourth, and for the time being, final version, he stated that Margaret Lee had approached him in the tavern at 10:10 p.m. on the night of the 14th and asked him to meet her at 1:45 a.m. on the morning of the 15th at the corner of 13th and Walnut Streets in Murphysboro. This location is approximately two blocks from the tavern. He went on to say that the two of them went upstairs to an apartment over the tavern and that the apartment was secured by a padlock. She produced a key, unlocked the door, and they went into the Wayne Saylor apartment, where she began to spray lighter fluid and requested Mr. Ellis' assistance, which he gave. While they were starting the fire, the defendant said that she was doing it because she and Charles Murphy were always fighting. After the fire was started they left and locked the door behind them. They descended the stairs and went their separate ways. After he gave this statement, Mr. Ellis was neither charged nor detained. He was allowed to get on his bicycle and go home. He was not charged for another nine months.

This fourth version is the one ultimately testified to at trial. However, the initial testimony by Mr. Ellis at trial was the same as the first version that he gave to the police.

"Q. Now, Mr. Ellis, I want to direct your attention back a couple of years to Friday, January 14, 1983. Let me ask you first, Bubba, do you remember the fire at Murph's Place?

A. Yes.

Q. Okay. I want to ask you about what you were doing, Bubba, the night before the fire. Okay?

A. Yes.

Q. Do you remember that night?

A. Yes.

\* \* \*

Q. Did you see Margaret Lee that night?

A. Yes.

Q. And do you remember what she was doing?

A. Was on the bar.

Q. Did you talk to Margaret Lee that night, Bubba?

A. Yes.

Q. Bubba, did Margaret Lee ask you to do anything on Friday night, January 14, 1983?

A. No.

\* \* \*

Q. And then where did you go, Bubba?

A. Went home.

Q. You went home?

A. Yeah.

Q. Okay. Did you ever go back downtown, Bubba? Downtown Murphysboro?

A. Not that I know of.

Q. Pardon?

A. Not that I know of.

Q. Did you go back to Murphy's Place that morning?

A. I talk to my lawyer.

Q. You want to talk to your lawyer?

A. Yeah."

After this testimony a recess was taken so that Mr. Ellis could talk to his attorney, Mr. Padish. Mr. Padish then informed the court that there were no self-incrimination problems, but that Mr. Ellis was confused by the rapidity of the questions and that if the State's Attorney would slow his questioning, Mr. Ellis' confusion would be rectified. The court, without objection, then stated that it would allow a certain amount of leading by the State's Attorney. Proceedings in front of the jury began anew and Mr. Clemons led Mr. Ellis through the fourth version of his story with no objection by defense counsel.

The cross-examination of trial counsel is set forth in full in Appendix A to this opinion. While it is somewhat lengthy, we feel it should be set forth in its entirety in Appendix A since its ineffectiveness (and indeed its affirmative harmfulness to the defendant's case) is one of the major points in defendant's challenge to her conviction.

The other major witness for the State was Mr. Chris Brindley,

who had been a resident in another upstairs apartment since November 1982. Mr. Brindley testified that he heard a noise out in the hall at approximately 2 a.m. He placed it at that time because he had just finished setting several alarm clocks that he had purchased at an auction earlier in the evening. He testified that he looked out in the hall and saw a woman from the shoulders up who was wearing a red jacket and who was "fiddling" with the door to Wayne Saylor's apartment. He didn't know the woman's name, but he recognized her from seeing her in the tavern downstairs and/or with Charles Murphy. He went to bed within five minutes of seeing the woman and was awakened a few minutes later by the smell of smoke. He and his roommate escaped through their window. He subsequently picked the defendant out of a photo lineup of five women. Of the five women, the defendant was the only one who wore her hair up. Mr. Brindley also identified the defendant in the courtroom.

In addition to Mr. Ellis and Mr. Brindley, the State called several witnesses who testified that they saw Charles Murphy's two-tone station wagon parked near the tavern at 1:50 a.m. on the morning of the 15th and that the defendant often drove Mr. Murphy's car. To establish the arson element of the case, the State called Mr. Barney West. Defense counsel neither consulted with nor called to trial an expert witness on this issue. Other witnesses for the State dealt with the identification of photos, exhibits, cause of death, and impeachment of the defendant.

After the State rested, defense counsel made the following opening remarks:

"THE COURT: *** [A]re you ready?

TRIAL COUNSEL: Yes, Your Honor. If it please the Court and Mr. Clemons, ladies and gentlemen of the jury, at the start of this trial I reserved opening statement until such time as the defendant was to place their case of record and I think the best statement to be made to this jury is by putting the defendant on the stand to give testimony and I'm going to call Margaret Lee."

Trial counsel immediately called the defendant as a witness. He hadn't decided to call her to the stand until that very day. Although he had discussed generally the areas he would be going into with her, he hadn't discussed her specific testimony with her before putting her on the stand. He had not shown her the handwritten statements she had given to the police some three years before the trial.

The defendant testified that she left the tavern with Charles Murphy at approximately 1:25 a.m., went to their home approximately

five minutes away, and went to bed. She denied returning to town, meeting Roger Ellis, and starting the fire. The defendant was impeached on the contents of her earlier statement as to the time that she left (12:50 a.m. in the statement) and as to whether or not she and Charlie Murphy had gone to the Eagles earlier in the evening.

Defense counsel called two witnesses who testified that they had driven by the Murphy place at approximately 1:45 and had not seen his car near the place. He also introduced into evidence a red jacket that Mrs. Lee had been wearing the night of the fire.

At the hearing on defendant's post-conviction petition several witnesses testified and established the following facts. Trial counsel was licensed to practice in 1954. From 1954 to 1956 he worked for the Chicago-Burlington-Quincy Railroad as an accountant. From 1956 to 1964 he worked for Chicago Title examining titles and reviewing abstracts. From 1964 to the time of trial he was engaged in the general practice of law in Murphysboro. He estimated that as a private practitioner approximately 20% of his work, including one prior murder case, was in the criminal field and approximately 50% of his work involved examining for an abstract company and rendering opinions upon the insurability of titles.

Appellate counsel list a multitude of mistakes committed by trial counsel and urge that they require reversal either singly (as to some of them) or certainly as a cumulative matter when all are considered. We will examine those errors that we perceive as more serious in the immediately succeeding pages and treat others more briefly in the concluding pages of this opinion.

The first of the criticisms deals with the witness Roger Ellis, who was obviously one of the State's most important witnesses since he testified that he was with the defendant and saw her start the fire. Appellate counsel criticize trial counsel's treatment of Roger Ellis in several respects: (1) he failed to file a motion *in limine* or otherwise challenge the competency of Mr. Ellis to testify as a witness; (2) assuming such a motion had been unsuccessful in excluding Mr. Ellis as a witness entirely, the cross-examination of Mr. Ellis was not only ineffective in its failure to attack, but it was affirmatively harmful in bolstering his credibility; and (3) trial counsel failed to call Dr. Cuneo to establish, at a minimum, that Mr. Ellis was easily led and would repeat stories.

We agree with all three criticisms. Dr. Cuneo was called as a witness for the defense in Mr. Ellis' trial in Federal court, and his testimony has been outlined earlier in this opinion. That testimony was available to and had been reviewed by trial counsel before the trial of

Margaret Lee. Also available to him, but never obtained or reviewed by him, were the opinions of Dr. Wisenhunt in 1977 and Dr. Boyd in 1976, both of whom expressed the opinion that Roger Ellis was incompetent to stand trial at the time of their examinations. The opinion of Dr. Boyd was obtained in relation to an arson charge pending against Mr. Ellis at that time.

■ Why then did trial counsel not challenge the competency of Roger Ellis? Was there some possible detrimental effect to the defendant's case if such a challenge were made and rejected? The answer to the latter question was obviously negative and trial counsel so testified at the post-conviction hearing. He also gave his answer to the first question. It was that he knew Mr. Ellis from seeing him around town and that he felt Mr. Ellis knew the difference between right and wrong. Whether his feeling was correct or not, it is not the appropriate legal test to determine the competency of a witness to testify. (See E. Imwinkelried, Evidentiary Foundations 17–28 (1980).) Basic textbooks on trial techniques are not the only source of authority as to witness competency. The law is clear that the ability to recognize right from wrong is only one of the prerequisites. (*People v. Sims* (1969), 113 Ill. App. 2d 58, 251 N.E.2d 795.) The *Sims* court discussed the appropriate standards in the following language (citations from the opinion are omitted):

> "In this state, every person who is fourteen years old is presumed competent to testify. [Citations.] When a child under that age is called to testify, it is the duty of the trial judge to determine first whether the child is competent as a witness. [Citations.] To do this, the judge must hold a preliminary inquiry into the competency of the proffered witness by examining the child's intelligence, understanding, and moral sense. [Citations.] If testimony is to be permitted, the court's inquiry must, with reason, satisfy the judge that the witness is sufficiently mature (1) to receive correct impressions by his senses, (2) to recollect these impressions, (3) to understand questions and narrate answers intelligently, and (4) to appreciate the moral duty to tell the truth (and comprehend the meaning of the oath)." *Sims*, 113 Ill. App. 2d at 61, 251 N.E.2d at 796-97.

As the above quote indicates, when a child under 14 is called to testify, the court should make a determination as to his competency. In this case Mr. Ellis' chronological age was obviously greater than 14, but mentally he was an eight- to nine-year-old child. If the court has the duty to make a determination, isn't it incumbent upon counsel to request a hearing on the issue? Isn't this particularly true in a case

such as this when the status of the witness' mental development is known from prior trial testimony? The answer must be yes and this is true without consideration of the prior opinions of incompetency discussed above, which while not reviewed by trial counsel, could have been. It has been held that the failure to properly investigate prior mental problems of a defendant so as to intelligently determine his competency to stand trial and/or the feasibility of an insanity defense amounts to ineffective assistance of counsel. (*People v. Howard* (1979), 74 Ill. App. 3d 138, 392 N.E.2d 775; *People v. Murphy* (1987), 160 Ill. App. 3d 781, 513 N.E.2d 904.) In *People v. Howard* the defendant mentioned her prior problems for the first time at the second hearing on competency. At that time they were mentioned only briefly and in passing. After her conviction the probation officer obtained a discharge summary of her prior hospitalizations in preparing the presentence investigation report. The appellate court held that this information should have been obtained and considered by trial counsel and that his failure to do so constituted ineffective assistance. The fact that defendant in that case was to a great extent uncooperative with her counsel did not excuse his failure to investigate. In *People v. Murphy* the court held that the defendant's confinement at the Residential Treatment Unit of the Cook County Department of Corrections, coupled with other circumstances, required further investigation. The court in *Murphy* stated:

> "Defense counsel has a duty to make reasonable investigations or to make reasonable decisions that make particular investigations unnecessary [citing *Strickland*]. Moreover, counsel has an affirmative obligation to make further inquiry where facts known and available or with minimal diligence accessible to him raise a reasonable doubt of the defendant's mental condition; and, a defendant is denied the effective assistance of counsel where reasonable grounds exist to question his sanity or competency but defense counsel fails to explore the issue." *Murphy*, 160 Ill. App. 3d at 789, 513 N.E.2d at 910.

While both of the above cases dealt with the *defendant*, the importance of Mr. Ellis' testimony in this case suggests that the same standard should apply to counsel's investigation of his background. This is particularly true given the ease of procuring information in this case. Defendant's counsel on her post-conviction petition had no difficulty in obtaining the earlier evidence of Mr. Ellis' incompetency to stand trial, a situation which is similar to the probation officer's search in *People v. Howard*. More importantly, Dr. Cuneo testified in Federal court about the prior tests conducted on Mr. Ellis. These

were obviously a part of Dr. Cuneo's file and were easily available to trial counsel. We therefore hold that the failure to properly investigate Mr. Ellis' prior mental difficulties and failure to request a hearing on the competency of Mr. Ellis fell "outside the wide range of professionally competent assistance." (*Strickland v. Washington* (1984), 466 U.S. 668, 690, 80 L. Ed. 2d 674, 695, 104 S. Ct. 2052, 2066.) We note that distinctions have been drawn between tactical decisions and misapprehensions of law. (See *People v. Wright* (1986), 111 Ill. 2d 18, 488 N.E.2d 973.) Trial counsel's misconception of Ellis' competency to testify was of the latter type.

Some writers contend that once a finding of ineffective counsel is made, reversal is mandated. (See, *e.g.*, Gabriel, *The Strickland Standard for Claims of Ineffective Assistance of Counsel: Emasculating the Sixth Amendment in the Guise of Due Process*, 134 U. Pa. L. Rev. 1259 (1986); Klein, *The Emperor Gideon Has No Clothes: The Empty Promise of the Constitutional Right to Effective Assistance of Counsel*, 13 Hastings Const. L.Q. 625 (1986).) The basis of their position is that our system of justice is based upon adversarial confrontation. In order to insure a fair result under that system, equally expert counsel would be the ideal. Recognizing that the ideal is impossible to attain in our real world, they argue that, at the minimum, competent counsel are absolutely necessary to provide a reliable result under the adversarial system. Therefore, they conclude that once ineffectiveness is established, the result is questionable and the case must be reversed.

■ The above conclusion, however, is not the one reached by the Supreme Court in *Strickland*. *Strickland* requires a two-prong test: first, was there ineffective assistance of counsel, and second, has the defendant established that the errors were serious enough to deprive the defendant of a fair trial, "a trial whose result is reliable." *Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.

The State argues that the second prong of the *Strickland* test cannot be met on the Ellis competency issue for two reasons. First, the original trial judge implicitly found Mr. Ellis competent to testify. Second, the trial judge on the post-conviction hearing explicitly found Mr. Ellis to be a competent witness. To the first of these arguments we must respond that the failure of trial counsel to adequately investigate and to adequately present evidence of Mr. Ellis' condition to the original trial judge is one of the bases of this appeal. With regard to the second contention, we acknowledge Judge Spomer's finding of competency of Mr. Ellis on the post-conviction hearing and give due deference to it. In view of further errors of trial counsel we need not

and do not decide whether Judge Spomer's decision was against the manifest weight of the evidence that was presented to him. We note that neither the original trial judge nor Judge Spomer conducted any specific inquiry into Mr. Ellis' competency. There may be future hearings on the competency of Mr. Ellis to testify in this case and we do not wish to influence the finding of the trial court in making that determination.

 The failure to challenge Mr. Ellis' competency does not end our discussion of trial counsel's treatment of this witness. Another point raised by appellate counsel was his failure to call Dr. Cuneo to the stand. Trial counsel indicated that his failure to call him was not based upon a tactical decision as to the wisdom of calling Dr. Cuneo as a witness. In fact he testified that had Dr. Cuneo been available, he would have called him, because even though Dr. Cuneo would not have been beneficial on the competency issue, he felt that he would have been beneficial to defendant's case by giving the testimony that Mr. Ellis was easily led. Trial counsel did not call Dr. Cuneo because he had not contacted him in time, subpoenaed him in time, and paid his fee in time to ensure his presence at trial. He did not move for a continuance based upon Dr. Cuneo's unavailability. In view of the importance of Dr. Cuneo, we feel that the failure to call him also establishes ineffective assistance of counsel.

In turning to other claimed errors, we want to discuss in some detail the cross-examination of Mr. Ellis by trial counsel. It should be mentioned that, before beginning his cross-examination, trial counsel had at least three versions of the events of that evening given by Mr. Ellis which were inconsistent with what he had just testified to at trial. They were as follows:

(1) the first version he gave to the police in which he denied any involvement at all;

(2) the second version which he gave to the police in which he indicated that he and Bobby Greenwell had participated in setting the fire;

(3) the third version he gave to the police in which he indicated that some unknown person had directed him to set the fire.

In addition to these, the original versions given to the police and provable through Officer Graff, he had available to him the transcripts of the Federal court proceedings in which Mr. Ellis had denied all involvement. He also had potentially available to him the earlier trial testimony of Mr. Ellis on direct examination in which he had again denied any involvement. This took place just before the recess

was taken and just before the State's Attorney was allowed to lead Mr. Ellis through the fourth version without any objection. Finally, he could have had Wayne Saylor testify to Mr. Ellis' denial of involvement, but trial counsel had never inquired of Mr. Saylor about that point. There is in the cross-examination only one short segment dealing with all of these prior inconsistent statements. The beginning of the cross-examination consists of three questions and answers and it is not again touched upon in the 14 pages of cross-examination. In addition to the foregoing, trial counsel had apparently interviewed Mr. Ellis on repeated occasions and he had given differing stories on those occasions. There is again only one reference to any of the prior interviews and it is one question and one answer in which the following was stated:

"Q. Did you tell me you weren't there that night?
A. Yes."

In addition to the foregoing materials, all of which were available and could have been used much more extensively than the four question-and-answer utilization that was made of them, it is apparent from the hearing on the post-conviction petition that additional statements were easily obtainable from Mr. Ellis. Appellate counsel's investigator testified that he interviewed Mr. Ellis and that Mr. Ellis said that he had never testified that Margaret Lee set the fire, and that rather than she being the perpetrator, he thought it was Marie Murphy. That statement, which would obviously have been very beneficial to the defendant's case at the original trial, was never obtained by trial counsel nor did he make any record of any of the inconsistent interviews that he had with Mr. Ellis during his handling of the case which could have been used, if necessary, to impeach Mr. Ellis.

 Impeachment of Mr. Ellis as to the happenings on the night or early morning hours in question was not the only fruitful source of cross-examination. Mr. Ellis had also been granted immunity by both the State and Federal authorities for any possible perjury charges that could be brought against him because his testimony in the State court was obviously diametrically opposed to the testimony he had previously given in the Federal court proceedings. The fact that this immunity had been granted was never brought out on cross-examination. Failure of trial counsel to use material that was available and/or to gather additional material to use in cross-examination of Mr. Ellis is another instance of ineffective assistance of counsel.

The failure of trial counsel to effectively attack either Mr. Ellis or his testimony is not the only instance of ineffective assistance that is exhibited in his cross-examination. The question of whether or not to

cross-examine at all must be addressed in a manner similar to physicians' care of patients: "First, do no harm." In other words, if the cross-examination is not going to be helpful to a client's case, and if it may be harmful, then it is probably better not to indulge in it at all. There can be no question that Margaret Lee would have been better served by no cross-examination, when none at all is compared with the cross-examination actually conducted.

If one of the basic rules is to do no harm, another is "don't repeat the direct examination!"

> "This may be the most commonly violated maxim of good cross-examination. Many are the lawyers whose standard approach is to have the witness 'tell it again' in the invariably groundless hope that the witness' testimony will somehow fall apart during the second telling. This approach almost invariably fails. It has merit only in situations where the witness' testimony appears memorized, or where certain parts of the direct examination support your theory of the case." (T. Mauet, Fundamentals of Trial Techniques 242 (1980).)

This rule was repeatedly violated and it was not, as suggested by the State in oral argument, a situation where trial counsel was employing the technique utilized in the Triangle Shirtwaist Factory Fire. In that case, Max Steuer listened to the carefully rehearsed story of one of the survivors and then on cross-examination said, "Sophie, tell it again." She did, word- for-word. His next question was, "Tell it again, Sophie." Again she repeated it verbatim. Mr. Steuer then forcefully and successfully argued that the witness had been coached into spewing forth the story solicited by the prosecutor. (I. Younger, The Art of Cross-Examination (1976).) This exception to the rule was brilliantly used by Mr. Steuer, but this was not the technique employed by counsel in this case. His cross-examination of Mr. Ellis repeatedly asked the witness to recite facts harmful to his client's case. We set forth below a few of these instances; more will be found in the appendix.

> "Q. Where was Marge at this time?
> A. In the kitchen.
> Q. She was in the kitchen then?
> A. Yes.
>
> \* \* \*
>
> Q. She lit the paper towels. What did she have to use to light the paper towels, do you know?
> A. I guess some lighter fluid up in Wayne Saylor's apartment.
>
> \* \* \*

Q. Now you say that the key was on Charlie's key ring?
A. Yes.
Q. And Marge had Charlie's key ring?
A. Yes.

\* \* \*

Q. Okay when you came up these stairs you stood here?
A. Yes.
Q. While Marge opened the door?
A. Yes.
Q. And when you came out she closed the door and you went down the stairs first?
A. Yes.
Q. And she parked the car in front of the Cairo Barbecue Sauce place?
A. Yes.

\* \* \*

Q. How many fires that night did Marge light, can you tell me?
A. I don't remember.
Q. When she lit them, how did she light them? Did she bend down and light them or throw paper towels on them or what?

\* \* \*

Q. And she lit the fires up by the couch?
A. The patio.
Q. She lit the fire in the patio?
A. Yeah."

If the jury had had some question about Mr. Ellis' ability to recall and remember because of the fact that he had to be led through direct examination by the State's Attorney, they would have been waiting for the cross-examination to destroy a witness who had to be led so much on direct. Instead of an exam that destroyed, refuted, impeached or attacked Mr. Ellis' testimony in some way, it received from trial counsel questions that were designed to elicit responses that damaged his client's position. It is unbelievable that the foregoing questions could have been asked of this witness by *defense* counsel. The elicitation of harmful matters on cross-examination has been criticized by Illinois courts in the past. *People v. Nitti* (1924), 312 Ill. 73, 143 N.E. 448.

In addition to the recapitulation of harmful testimony outlined above, trial counsel repeatedly obtained an answer helpful to his client's case and then *led* the witness to recant the helpful answer. Only two of these instances will be set forth below; the first deals with the

fact that he had recently been discharged or laid off by Mr. Charles Murphy; the second deals with Mr. Ellis stating that he first learned of the fire the next morning.

"Q. Did Charlie—had Charlie laid you off by any chance?

A. Yes.

Q. Now, you say that Charlie rehired you, you were going to go back to work for him on Sunday? Or for the birthday celebration? Which?

A. I guess the birthday, I guess.

\* \* \*

Q. Is that the first time that you learned about the fire?

A. Yes.

Q. Can you tell me what time of day that was that Bobby came in to tell you?

A. Seven o'clock in the morning.

\* \* \*

Q. I'm a little confused, Bubba. You said you set the fire and then when I asked you if Bobby Worthen told you about the fire and that was the first time you learned of the fire, you said yes.

A. After the night.

Q. Pardon?

A. After the night in the morning at seven.

Q. That night?

A. Yeah. Me and Marge set it.

Q. You set it. But you first learned about the fire when Bobby Worthen told you about it, is that true?

A. Second time.

Q. That isn't what I asked you. I said—you told me that when Bobby Worthen told you about the fire at seven o'clock in the morning that was the first time that you learned of the fire?

A. Yeah.

Q. You said that's right?

A. Yes.

Q. *Didn't you know of the fire before Bobby Worthen talked to you?*

A. Yes." (Emphasis added.)

■■ The final example that we will quote concerns trial counsel's proof of prior consistent statements by a witness adverse to his client's interests. Those questions and answers are set forth below.

"Q. Can you tell me approximately how many times the po-

lice officers have talked to you about this fire?

A. A lot of times.

Q. A lot of times. As many as ten?

A. Yeah.

Q. Or more?

A. About eleven or twelve.

Q. Eleven or twelve times?

A. Yes.

Q. *And you sat and talked to them about this and told them basically this same story the twelve times?*

A. Yes." (Emphasis added.)

It is clear that prior consistent statements are generally inadmissible. (*People v. Tidwell* (1980), 88 Ill. App. 3d 808, 410 N.E.2d 1163.) An exception to the rule of inadmissibility may exist when the person proffering the witness is attempting to rebut an allegation of recent fabrication. (*People v. Thibudeaux* (1981), 98 Ill. App. 3d 1105, 424 N.E.2d 1178.) This court is aware of no case dealing with the proof of prior consistent statements on cross-examination. The lack of cases on this point is in all likelihood due to the fact that most lawyers are not interested in bolstering the credibility of a witness in cross-examination. While it may be that some witness in some case at some point in time may be so helpful to the cross-examiner that the cross-examiner would wish to bolster his credibility, that situation was not presented in this case.

From the excerpts of the cross-examination and from our comments regarding them, it should be apparent that we feel that the cross-examination conducted by trial counsel of the State's most crucial witness fell below the standards required of effective representation.

We now turn to the defense counsel's lack of opening statement, or ineffective opening statement, depending upon the characterization that may be given to it. The opening statement in its entirety has been set forth in this opinion. The first error that may have been made was reserving the opening statement until the close of the State's case. This has the obvious effect of allowing the prosecutor to make an opening statement and present all of his testimony prior to the jury being advised in any manner of the defense theory of the case. Assuming that there may have been some tactical reason to reserve opening statement until the close of the State's case (although this seems highly unlikely in view of the fact that defense counsel must have known that the State would follow essentially the same format that it followed in the Federal court proceedings, a copy of the

transcript of which was in his possession), it is inexplicable that a more cogent opening statement was not made. This case does not present the situation where the relative lack of discovery in a criminal as opposed to a civil case might dictate a more reticent opening statement. This case had been essentially tried before when the case against Roger Ellis was tried in Federal court. The format of the presentation in both trials was essentially the same. Defense counsel therefore had a full and complete preview of the State's evidence, its order of presentation, the points it would stress, and the conclusions it would reach. He knew or should have known both the strengths and the weaknesses of the State's case and yet he failed to avail himself of the opportunity to comment upon them at the earliest point in the trial by reserving his opening statement until the end of the State's case. When he finally made his opening statement, he said nothing, informed the jury of nothing, and admitted at the hearing on the post-conviction petition that his opening statement did not advise the jury of his theory of the case.

 Many commentators have stated that the opening statement is the single most important portion of a trial.

"Since some studies show that approximately 80% of jurors decide who should win the case during the opening statements, the importance of the opening statement cannot be overstated. Clarity and logic are the goals; when you finish the opening, the jury should have a clear understanding of the case, your theory, and why you should win." Jossen, *Opening Statements: Win It In The Opening*, The Docket, The Newsletter of the National Institute for Trial Advocacy, Vol. 10, No. 2, Spring 1986, at 1.

"The sincerity, candor and preparation that you show on opening argument can set the tone for the entire trial. No juror can escape liking one attorney more than another. A showing of ineptitude, uncertainty, lack of preparation, insincerity, or lack of identification with your client or his cause can cripple, if not destroy, your case at the outset. On the other hand, if you can establish a rapport with the jury, the entire trial may well be tipped in favor of your client. Opposing counsel will be saddled with the burden of overcoming the presumption of good faith you have created." Marshall, *The Telling Opening Statement*, Prac. Law., Oct. 1973, at 27, 28.

"It is difficult to imagine a situation where a party, either plaintiff or defendant, would find it advantageous to waive making an opening statement. Remember that trials are con-

ducted to see which viewpoint of a disputed set of the facts the jury will accept as true. Making an effective opening statement gives you a head start over your opponent. Take advantage of the opportunity." T. Mauet, Fundamentals of Trial Techniques 56 (1980).

The State argues that the defendant's contention that trial counsel made no opening statement is factually incorrect since the record reveals that when called upon by the trial court to proceed he made some preliminary remarks which the State equates with an opening statement. To equate Mr. Hendricks' remarks with an opening statement is like equating the child's nursery rhyme Hickory Dickory Doc with The Death of the Hired Man by Robert Frost. The former is arguably entitled to the appellation of poem; it has words, it rhymes, it says something, although nothing particularly meaningful. The latter has earned a well deserved place in American literature; it introduces the participants, delves into their backgrounds, brings to life the never seen and soon-to-die Silas and culminates with the pronouncement of his death in five carefully chosen words. This contrast is not meant to imply that every opening statement must be a work of art, but, given its recognized importance at trial, it must consist of something more than a few meaningless words to be entitled to the characterization of opening statement.

As has been indicated, the lack of an opening statement in this case is even more inexplicable when one realizes that trial counsel had the earlier Ellis trial for a preview of what was going to occur in the Margaret Lee trial. The importance of primacy, the tendency of people to believe most deeply that which they have first heard, obviously gives the prosecution a distinct advantage in a criminal case. (Colley, *The Opening Statement: Structure, Issues, Techniques,* Trial, Nov. 1982, at 53.) Reserving an opening statement in a case such as this and thus allowing the State the added advantage of reinforcing its opening statement with all of its evidence before the jury hears anything else, raises some question about the competency of counsel, but it *may* have been an appropriate tactical choice. (*People v. Greer* (1980), 79 Ill. 2d 103, 402 N.E.2d 203.) But to make such a reservation and then to make such a mockery of one of the most meaningful aspects of a trial is another example of ineffective assistance of counsel.

It should be noted that immediately after his introductory remarks trial counsel called the defendant to the stand. He hadn't decided to call her until that very day. He hadn't furnished her the statement she had given to police three years earlier. As a direct

result of that act of incompetence she was impeached as to the time she left the tavern. The exact time that she left the tavern was of little consequence, but the fact that she was impeached is of grave consequence. Impeachment by a prior inconsistent statement is one of the most effective means of cross-examination. It creates an impression in the fact finder's mind that carries over to the other testimony of the witness.

> "Impeachment is the most dramatic trial technique in the lawyer's arsenal. Selectively used and effectively employed it can have a devastating effect at trial. Jurors appreciate effective impeachment. They enjoy seeing a witness 'caught' changing his story." T. Mauet, Fundamentals of Trial Technique 234 (1980).

While the jury is not advised of the significance of any other cross-examination technique, there is a specific instruction which is given on the effect of impeachment by prior inconsistent statement. (Illinois Pattern Jury Instructions, Criminal, No. 3.11 (2d ed. 1981).) In this trial Roger Ellis could have been the subject of extended impeachment. He was not. Margaret Lee would never have been impeached if her lawyer had only furnished her three-year-old statement to her. He did not.

■■ In addition to not furnishing his client with her own statement, Mr. Hendricks admitted that he did not prepare her for her trial appearance other than a general discussion. He never went into the specific testimony that he would be eliciting from her before putting her on the stand. These are additional examples of ineffective assistance of counsel.

■■ The errors we have discussed thus far in this opinion have all been instances of ineffective assistance of counsel. We do not hold that each instance of ineffectiveness would warrant reversal, although the errors in the cross-examination of Mr. Ellis alone, given his importance in the case, would certainly suggest the need for reversal. We recognize that an accumulation of errors can require reversal when a single instance would not. *People v. Bell* (1987), 152 Ill. App. 3d 1007, 505 N.E.2d 365.

The ineffectiveness in this case is clear. What about its effect on the outcome? The easy answer to this question would be to state that Mr. Ellis, who had given a confession to the crime, was represented by a different lawyer and was acquitted. Therefore, the answer would continue, if Margaret Lee, who has never admitted guilt, had had the same quality of representation, she would have been acquitted also. This answer overlooks the testimony of Mr. Brindley, who identified

Margaret Lee, but not Mr. Ellis and the additional evidence given against the defendant by the testimony of the witnesses who saw Mr. Murphy's car near the scene at approximately 2 a.m.

With regard to the automobile testimony, we point out that trial counsel made no serious challenge to the identity of the car (none of the witnesses identified it by license plate; all by appearance only). He did challenge the timing of the identification of the car by Mrs. Murphy by suggesting, but not proving, that the VFW, which she had left immediately before seeing the car, closed at 1 a.m. rather than 2 a.m. With regard to Mr. Brindley, defense counsel did not impeach him with his original statements to the police that: (1) the woman was 5 feet 6 inches tall (the defendant is 5 feet tall); and (2) the woman had *short* hair (the defendant's hair was worn in what is colloquially known as a "beehive"). These differences are significant. The failure to impeach Mr. Brindley is not of the magnitude of the failures committed in the cross-examination of Mr. Ellis, but the jury was deprived of the knowledge of their existence. That deprivation could only have damaged the defendant's position with the jury, and as has been stated:

> "[J]uries evaluate many subjective, as well as objective, factors that bear on determining witness-credibility, and may well have been influenced in ways that a court reviewing the cold, written record could not determine. An effective attorney, having properly investigated the case, may have been able to cross-examine the crucial prosecution witness in a manner that would have impacted on the witness' credibility and demeanor in ways the reviewing court could never ascertain." Klein, *The Emperor Gideon Has No Clothes: The Empty Promise of the Constitutional Right to Effective Assistance of Counsel*, 13 Hastings Const. L.Q. 625, 642 (1986).

There are many other trial errors raised by appellate counsel, including the failure to call numerous witnesses and the ineffectiveness of trial counsel's closing argument. We will not lengthen this opinion by reciting them except to note that with regard to the closing arguments it is difficult to understand why trial counsel did not argue the obvious question as to why Margaret Lee or any potential arsonist would have enlisted the aid of Roger Ellis to commit the crime. We feel it is clear that not only was trial counsel's conduct ineffective, but that his ineffectiveness has brought about a result that cannot be relied on under the second prong of the *Strickland* test.

■■■ We are aware that trial judges are placed in a difficult position in deciding these matters on post-conviction petitions. They are

forced to review cold records and engage in hindsight in judging the conduct of local attorneys who may do a credible job of representing their clients most of the time, but it is not the conduct of an attorney most of the time that must be judged in these cases, and concern for the attorney should not be the paramount concern. Instead, "[w]e must come to realize that the issue in effectiveness of counsel cases is not the culpability of the lawyer but the constitutional right of the client." (Bazelon, *The Defective Assistance of Counsel*, 42 U. Cin. L. Rev. 1, 25 (1973).) We, as an appellate court, must also heed the warning of Justice Bazelon:

> "In warning that the sixth amendment guarantee of effective assistance of counsel is in danger of becoming a dead letter in the courts of our major urban jurisdictions, I have concentrated on the problem at the trial level, but the appellate courts must share the responsibility. One of the major reasons that the problem of ineffective assistance has remained hidden is the appellate courts' remarkable propensity to ignore the issue of ineffective assistance altogether and to paper over the cracks in the house that *Gideon* built." 42 V. Cin. L. Rev. at 20-21.

Responding to Justice Bazelon's call to refuse to "paper over the cracks in the house that *Gideon* built" is not without problems. We are aware that reversals create hardships for witnesses who must appear again and for prosecutors who must prepare and present them again, and for the courts and the jurors who must hear them. We are also aware, however, of the preeminent place that the right to an effective counsel plays in the protection of every individual accused of crime and the auxiliary role that such counsel play in insuring that the trials in our courts produce just results.

Therefore, we reverse and remand this case for a new trial.

Reversed and remanded.

HARRISON and RARICK, JJ., concur.

APPENDIX

CROSS-EXAMINATION
Conducted by Mr. Hendricks

"Q. Bubba, what was Marge wearing that night?
A. I don't remember.
Q. You don't remember?
A. No.

Q. Now, in Federal court you said that Marge and you were not at Murph's Place that night, did you not?

A. Yes.

Q. Okay. And you also gave a statement to Mr. Graff concerning this, did you not?

A. Yes.

Q. In that statement do you remember saying that you were afraid that Marge would hit you in the head if you testified in Federal court other than the way you did?

A. No.

Q. Okay. Now, as I understand this, did you close the door behind you when you went into Wayne's apartment?

A. Yes.

Q. Did you latch the door when you went into Wayne's apartment?

A. No.

Q. You didn't? And you went in first?

A. Marge did.

Q. Marge did. But you walked up to the lawn mower?

A. Yeah.

Q. And you spilled the lawn mower? You turned it over?

A. Yes.

Q. Did gas flow out of the lawn mower?

A. Yes.

Q. And then you went from the lawn mower to where? To the kitchen?

A. Yes.

Q. Where was Marge at this time?

A. In the kitchen.

Q. She was in the kitchen then?

A. Yes.

Q. Now, this rug that's up here, did you put gasoline on that too?

A. Yes.

Q. You did. And then you opened the rug and rolled it down?

A. No. Leave it rolled up.

Q. You left it rolled up?

A. Yes.

Q. Did you bring it down to this area of the room?

A. No.

Q. Did you light that rug?

A. Yes.

Q. You did? What did you light it with?

A. My lighter.

Q. Your lighter. What did Marge use to light?

A. The paper towels.

Q. She lit the paper towels. What did she have to use to light the paper towels, do you know?

A. I guess from some lighter fluid up in Wayne Saylor's apartment.

Q. I didn't understand you, Bubba.

A. I guess from lighter fluid.

Q. You think that she had a lighter too?

A. Yes.

MR. CLEMONS: I don't believe that's what he said, Your Honor.

Q. (By Mr. Hendricks) Lighter fluid? Is that what you said, lighter fluid?

A. Yeah.

Q. What did she use to light it with? A match?

A. Lighter.

Q. A lighter. Where was this—you mentioned lighter fluid. Where was this lighter fluid at, do you know?

A. On the cabinet.

Q. On the cabinet. In the kitchen?

A. Yes.

Q. Did she go right to the lighter fluid and pick it up in the kitchen?

A. Yes.

Q. What did she do when she picked up the can of lighter fluid?

A. Walked to the drawer.

Q. Pardon?

A. Walked to the drawer.

Q. Walked in the door?

A. Drawer.

Q. Drawer. She looked in the drawer or opened the drawer or what?

A. Opened.

Q. Opened the drawer?

A. Yeah.

Q. Did she get something out of it?

A. Got a knife.

Q. She got a knife out?

A. Yeah.

Q. Then what did she do?

A. Cut the top of it.

Q. Now when you say top, are you talking about just a little spout

or the top off the—

A. The whole top.

Q. The whole top?

A. Yeah.

Q. It wasn't just the plastic part, it was the whole top that came off?

A. The lighter fluid got a little spout.

Q. Yeah.

A. A plastic thing.

Q. Yeah.

A. Cut the plastic thing off.

Q. Cut the plastic off?

A. Yeah.

Q. Now, you say that the key was on Charlie's key ring?

A. Yes.

Q. And Marge had Charlie's key ring?

A. Yes.

Q. Did you go into the tavern at all that night?

A. Yes.

Q. You went into the tavern with Marge?

A. No.

Q. No, I'm not talking about earlier in the evening. I'm talking about when you testified you came back and went up to the apartment. Did you go into the tavern first?

A. No.

Q. You didn't. And you set the fire in the kitchen?

A. Just one.

Q. Just one?

A. Yeah.

Q. Did you put it out?

A. Yes.

Q. Did you set any other fire there that night?

A. On the throw rug.

Q. On the throw rug. Did you put it out?

A. Yes.

Q. Did you put gasoline on that throw rug?

A. Yes.

Q. Where did you get the gasoline? From the lawn mower?

A. Yes.

Q. How much—can you tell me about how much gasoline was there?

A. I don't remember.

Q. You don't remember?

A. No.

Q. Quite a bit or—

A. About a little bit.

Q. A little bit. Okay. Did you take the top off of the—did you unscrew the gas cap?

A. Yeah.

Q. Did you leave the gas cap off of the lawn mower?

A. I put it back on.

Q. Did you carry the mower to the rug to put the gasoline on there?

A. No.

Q. How did you get the gasoline onto the rug?

A. Dump it out. It run down.

Q. You dumped the lawn mower—you dumped the gasoline out and let the gasoline run to the rug?

A. Yeah.

Q. That would take quite a bit of gasoline, wouldn't it?

A. The lawn mower was right by the rug.

Q. Pardon?

A. The lawn mower was by the rug.

Q. Oh, you dumped it by the rug?

A. Yeah.

Q. In other words, you didn't turn it over here. You took the lawn mower up here and dumped it? If I'm going too fast for you, Bubba, you let me know. All right. Where did you turn the lawn mower over and get the gasoline out of it?

A. Okay. Here's the rug right here.

Q. Yes, sir.

A. This is the lawn mower right here.

Q. Right.

A. The lawn mower was by the rug.

Q. The lawn mower sits right by the rug?

A. Yeah. A long rug. Here's the couch here.

Q. Yes, sir.

A. The rug run down to the couch.

Q. Are you telling me that the floor was covered with the rug?

A. Like this.

Q. Like this. Was the floor covered with a rug like this?

A. No. One bundle.

Q. Rolled up in a bundle.

A. Yeah.

Q. Did you unroll that bundle?

A. No. A long rug was down.

Q. That rug stretched—it was rolled up all the way down to the lawn mower?

A. Long rug.

Q. Was it laying on its side or was it standing up?

A. Laying down.

Q. Laying down.

A. Yeah.

Q. Now, are you sure—are you talking about this rug or was there a rug underlayment type thing? Do you know what a rug pad is?

A. Yes.

Q. You know, stuff you put under a rug, was that what was laying here?

A. Yes.

Q. Okay. It wasn't a rug, then, it was a padding?

A. Yes.

Q. Can you describe this padding to me? Do you know what it looked like?

A. Yes.

Q. Can you tell me what it looked like?

A. It was red.

Q. It was red.

A. Yes.

Q. Do you know what foam rubber is?

A. Yes.

Q. Was it foam rubber?

A. Yes.

Q. And you dumped the gasoline here and it ran on this rug here, or this thing that was laying down?

A. Yes.

Q. Now, how long—you can go back and sit down. Did you turn on any lights in the apartment?

A. Just on the kitchen light.

Q. You turned on the kitchen light?

A. Yes.

Q. And then when you were leaving you turned them off again?

A. Yes.

Q. What was put on the couch?

A. I believe the bedspread.

Q. No. This is the couch here. Was anything put on there like paper towels or anything?

A. No.

Q. Nothing was put on there?

A. No.

MR. HENDRICKS: Excuse me a moment, Your Honor.

THE COURT: Very well.

Q. (By Mr. Hendricks) When you left you left first and went down the stairs?

A. Yes.

Q. Did you walk down the stairs, run down the stairs?

A. I walked down the steps.

Q. Pardon?

A. I walked down.

Q. Was there a lot of fire in the apartment when you left?

A. Yes.

Q. There was a lot of fire in it?

A. Yes.

Q. And Marge came up behind you?

A. Yes.

Q. Did you see her lock the door?

A. No.

Q. All right. When you went in who went in first?

A. Marge.

Q. Where were you standing when Marge opened the door?

A. Right by the door.

Q. You were—you were standing here?

A. By the light.

Q. Pardon?

A. By the light.

Q. You were standing by the light?

A. Yes.

Q. Out here in the hallway?

A. Yes.

Q. May I remove this please? Now, you looked at this exhibit here and do you recognize this as the second floor of Murph's Tavern, the way it's laid out?

A. Yes.

Q. You do?

A. Yes.

Q. Okay. When you came up these stairs you stood here?

A. Yes.

Q. While Marge opened the door?

A. Yes.

Q. And when you came out she closed the door and you went down the stairs first?

A. Yes.

Q. And she parked the car in front of the Cairo Barbeque Sauce place?

A. Yes.

Q. Do you know if there were any other cars on the street that night, Bubba?

A. One.

Q. What was that?

A. Doris Roberts's car.

Q. Where was it at?

A. Across the street.

Q. Doris Roberts's car was across the street?

A. Yes.

Q. Do you know what kind of car Doris Roberts has?

A. A red Chevrolet.

Q. A red Chevrolet?

A. Yes.

Q. Now, you said that you stayed at the Da-Nite until closing time.

A. Yes.

Q. What is the closing time of the Da-Nite?

A. Quarter to two.

Q. Quarter to two, not two?

A. Yes. Quarter to two.

Q. Okay. And had you been drinking that night?

A. Yes.

Q. Quite a bit?

A. Yes.

Q. And where, for the jury, in Murphysboro is the Da-Nite lo-cated?

A. On 14th Street.

Q. Yeah. Is it close to Murph's Tavern?

A. No.

Q. Is it in the north part of town, would you say?

A. North part of town.

Q. Is it more than a mile away?

A. About from Da-Nite twenty-two blocks.

Q. Twenty-two blocks?

A. Yes.

Q. Now, what time did you meet Marge Lee? Do you know what

time it was when you met her?

A. Sure don't.

Q. Sometime after 1:45, before two o'clock?

A. Yes.

Q. After this fire the police officer talked to you on several occasions?

A. Yes.

Q. And in these conversations or questionings of the police officers, did they go over the details of this fire with you?

A. Yes.

Q. Did you talk to me last night?

A. Yes.

Q. What did you tell me?

A. I forgot now.

Q. Pardon?

A. I forgot.

Q. You forgot.

A. Yeah.

Q. Did you tell me you weren't there that night?

A. Yes.

Q. Could you smell the gasoline in that room, Bubba?

A. Just a little bit.

Q. You could just smell a little bit?

A. Yeah.

Q. But you could smell it. Now, you are the one that dumped the lawn mower, right? It's pretty heavy.

A. Yeah.

Q. Did you take the lawn mower upstairs?

A. In fall of the year, in last part of October or first of November. Me and Wayne did.

Q. You and Wayne did?

A. Yes.

Q. Did you carry anything else up to Wayne's apartment for him?

A. Yes. Put the cabinets.

Q. The what?

A. Cabinets.

Q. Can you answer that one—

A. Put the cabinets.

Q. Cabinets.

A. Yeah. Put on the wall.

Q. Oh. Cabinets. Okay. When was that?

A. Two years back.

Q. Years back?

A. Yeah.

Q. Okay. Prior to—after October were you ever in Wayne's apartment? After you put the lawn mower in Wayne's apartment had you returned to Wayne's apartment?

A. Yes.

Q. When?

A. With Wayne. When it's cold, bad weather, can't get home.

Q. When what? I can't quite understand you.

A. When it's cold and bad weather.

Q. Cold and bad weather?

A. Yes.

Q. You would go up to Wayne's apartment?

A. Yes. Me and Wayne does.

Q. That was just before the fire?

A. Been a lot of times.

Q. A lot of times. And the day of the fire were you working for Charlie?

A. For next day.

Q. You were going to work for him the next day?

A. Yeah.

Q. Did Charlie—had Charlie laid you off by any chance?

A. Yes.

Q. When did he lay you off?

A. I don't remember.

Q. You don't remember. Was Charlie's birthday coming up?

A. Yeah.

Q. When was that, do you know?

A. January 16th.

Q. The 16th. Was there going to be a celebration for that?

A. Yes.

Q. Now, you say that Charlie rehired you, you were going to go back to work for him on Sunday? Or for the birthday celebration? Which?

A. I guess the birthday, I guess.

Q. Now, this income that you receive, is that Social Security?

A. Disability.

Q. Social Security disability?

A. Yes.

Q. Do you know what it's based on? Why you get it?

A. Unable to work.

Q. You're not able to work?

A. No.

Q. Do you know why you're not able to work?

A. Cause I can't talk right.

Q. You can't talk right. Now, you were in jail prior to your trial, were you not?

A. Yes.

Q. And then when you were released from that trial you were in jail upstairs?

A. Yes.

Q. Did you talk to anybody upstairs about this?

A. No.

Q. You didn't talk to anybody at all upstairs?

A. Nobody.

Q. Did you ever go into that apartment alone?

A. Yeah.

Q. Where did you get the key?

A. Wayne.

Q. Wayne always give you the key?

A. Yeah.

Q. Now, Mr. Wayman lived up there, did he not?

A. Yeah.

Q. You know Mr. Wayman?

A. Yes.

Q. Did he have a dog?

A. Yes.

Q. When you would go upstairs to go into Wayne's apartment, did that dog bark?

A. Yes.

Q. Did he bark that night?

A. I don't know.

Q. You don't know. You don't remember the dog barking that night?

A. No.

Q. But other times when you went up that dog would bark?

A. Yes.

Q. Would he make fairly loud noise so you could hear him in the hall?

A. Yes.

Q. But you don't remember a dog barking that night?

A. No.

Q. What time does Murph's close, do you know?

A. I think midnight.

Q. Murph's closes every night at midnight—I mean all the time at midnight?

A. Part time it's open to two.

Q. Pardon.

A. Open to two.

Q. Sometimes it's open till two?

A. Yeah.

Q. On the weekends is generally when it's open to two, right?

A. Yeah.

Q. Did this happen on a weekend?

A. Yes.

Q. Did Marge talk to you in the tavern that night?

A. Not that I know of.

Q. Not that you know of?

A. No.

Q. Well, then how come you went from Da-Nite to the City National Bank?

A. I don't know. No idea.

Q. Did you go there with the intention of meeting Marge Lee?

A. Someone told me.

Q. Who told you?

A. Someone. I can't think of his name.

Q. Can't think of their name?

A. No. Name is Richard.

Q. Richard?

A. Yeah.

Q. Where did he tell you this?

A. At Da-Nite. He's moved back to Chicago now.

Q. Oh, Richard's moved back to Chicago now?

A. Yeah.

Q. And he told you at the Da-Nite that you were to meet Marge Lee at the—

A. Thirteenth and Walnut.

Q. Thirteenth and Walnut?

A. Yeah.

Q. Do you remember telling Officer Graff that Marge Lee talked to you in Murph's Tavern by the refrigerator and told you to meet you here later?

A. I don't remember.

Q. You don't remember saying that to Mr. Graff?

A. No.

Q. Okay. Do you remember Richard's last name?

A. Sure don't.

Q. Sure don't. You say you met him at the Da-Nite?

A. Yes. He's a bartender.

Q. Pardon?

A. He was the bartender.

Q. He was the bartender?

A. Yes.

Q. Oh. The bartender at the Da-Nite told you to meet Marge?

A. Yes.

Q. Now, when did he tell you this, Bubba? Just before you left the Da-Nite?

A. Yeah.

Q. That's when he told you to go down and meet Marge?

A. Yes.

Q. Who were you playing pool with that night? Do you know?

A. (No response.)

Q. Who were you playing pool with that night, do you remember?

A. I don't remember.

Q. Okay. Were you drinking at the Da-Nite also?

A. Who?

Q. Were you drinking at the Da-Nite?

A. Yes.

Q. What time did you leave Murph's Tavern that night? The first time. Before you went to the Da-Nite, what time did you leave the tavern?

A. About eight.

Q. About eight. Then you went directly to the Da-Nite?

A. Come back to Murph's Tavern come back to.

Q. You what?

A. I went in Murph's Tavern to get some egg cartons.

Q. Yeah. But you say you left Murph's Tavern at eight o'clock at night?

A. Yeah. Come back about nine.

Q. You came back about nine?

A. Yeah.

Q. When did you leave again?

A. About midnight.

Q. About midnight.

A. Yeah.

Q. And as I understand it, you received a ride from Murph's Tavern to the Da-Nite?

A. Yes.

Q. And two girls took you up there?

A. Yes.

Q. They didn't bring you back, did they?

A. No.

Q. You walked back?

A. Yes.

Q. Do you remember talking to Mr. Graff and him asking you why you went up to the apartment with Marge?

A. Well, Curt Graff—Curt Graff told me—point the finger at me one day.

Q. Curt Graff told you what?

A. Point his finger at me one day.

Q. He put the finger on you?

A. Yeah.

Q. What I asked you, Bubba, do you remember talking to Curt Graff and telling him why you went up to the apartment with Marge Lee?

A. Get a piece of ass.

Q. Get a piece of ass. Okay. Now, where did the paper towels come from, Bubba?

A. Off of the wall.

Q. Off of the wall. How many fires that night did Marge light, can you tell me?

A. I don't remember.

Q. When she lit them how did she light them? Did she bend down and light them or throw paper towels on them or what?

MR. CLEMONS: Your Honor, I believe he's been asked and answered this on cross examination.

THE COURT: It is proper cross examination. Your objection is overruled.

Q. (By Mr. Hendricks) You said she used a lighter?

A. Yes.

Q. All right. But did she use paper towels or did she light them by bending down?

A. I guess bend down. I guess.

Q. You guess. You don't recall. If I recall correctly, you said that you lit the fire as you were going out the door, is that right?

A. Yes.

Q. And she lit the fires up by the couch?

A. The patio.

Q. She lit the fire in the patio?

A. Yeah.

Q. Well, who lit the fire by the couch?

A. I did.

Q. You did. How did you light that fire? I know you had a lighter, but how did you light it? Did you bend down?

A. Yes.

Q. Can you give me an estimate of the length of time that you were in Wayne Saylor's apartment?

A. Been in Wayne Saylor's apartment a lot of times.

Q. I'm sorry. That night when you and Marge went into the apartment, how long did you stay in the apartment?

A. About fifteen, twenty minutes.

Q. Fifteen to twenty minutes. Were you quiet?

A. Yes.

Q. You weren't making any noise?

A. No.

Q. When you exited the apartment did the dog bark? When you came out ofthe [sic] apartment did the dog bark?

A. No.

Q. Was there a lot of smoke in the apartment?

A. Yes.

Q. Can you describe the smoke to me? Can you tell me what the smoke looked like?

A. It was blue.

Q. It was blue?

A. Yes.

Q. And you went home after the fire was set?

A. Yes.

Q. Did you ever go back to the scene of the fire that night?

A. No.

Q. When did you go back?

A. Next morning.

Q. Next morning. Did anybody tell you about the fire?

A. My next door neighbor.

Q. Your next door neighbor?

A. Yeah.

Q. Who is that?

A. Bobby Worthen.

Q. Bobby Worthen. He came over and told you about the fire?

A. Yes.

Q. Is that the first time you learned about the fire?

A. Yes.

Q. Can you tell me what time of day that was that Bobby came in

to tell you?

A. Seven o'clock in the morning.

Q. Seven o'clock in the morning. Do you know what time it was when you got home that night?

A. Sure don't.

Q. You don't. Did you go right to bed?

A. Yes.

Q. Did you go down to Murph's Tavern tha [sic] morning?

A. Yes.

Q. I'm a little confused, Bubba. You said you set the fire and then when I asked you if Bobby Worthen told you about the fire and that was the first time you learned of the fire, you said yes.

A. After the night?

Q. Pardon?

A. After the night in the morning at seven.

Q. That night?

A. Yeah. Me and Marge set it.

Q. You set it. But you first learned about the fire when Bobby Worthen told you about it, is that true?

A. Second time.

Q. At the time?

A. Second time.

Q. Second time?

A. Yeah.

Q. That isn't what I asked you. I said—you told me that when Bobby Worthen told you about the fire at seven o'clock in the morning, that was the first time that you learned of the fire?

A. Yeah.

Q. You said that's right.

A. Yes.

Q. Didn't you know of the fire before Bobby Worthen talked to you?

A. Yes.

Q. You did. Did you receive any money or anything from Marge Lee?

A. No.

Q. Can you tell me why you helped her with the fire?

MR. CLEMONS: Your Honor, I believe Mr. Hendricks has asked him that and he's answered. I would object.

THE COURT: Overruled. Overruled. You may answer if you understand the question, Mr. Ellis.

Q. (By Mr. Hendricks) Can you tell me why, if you helped set the

fire, you helped set it?

A. I don't know.

Q. You don't know.

A. No.

Q. Did she give you any reason that she wanted to set the place on fire?

A. No.

Q. Can you tell me approximately how many times the police officers have talked to you about this fire?

A. A lot of times.

Q. A lot of times. As many as ten?

A. Yeah.

Q. Or more?

A. About eleven or twelve.

Q. Eleven or twelve times?

A. Yes.

Q. And you sat and talked to them about this and told them basically this same story the twelve times?

A. Yes.

Q. Now, where did these conversations take place? At the police department of your home? Where?

A. Down at the police station.

Q. Did you say the police department?

A. Yeah?

Q. Was the same police officer always present?

A. Yes.

Q. You've never been convicted of a felony, have you? Do you know what a felony is?

A. I don't know.

Q. Okay. This is a felony that we're talking about, arson or setting fires. That's a felony. Or anything that can send you to the penitentiary is a felony. You've never been convicted of anything that would send you to the penitentiary, have you?

A. No.

MR. HENDRICKS: I have no further questions, Your Honor.

THE COURT: Anything further of this witness, Mr. Clemons?

MR. CLEMONS: Yes, Your Honor. Thank you."