529 So.2d 659 (1988)
Anthony Lamarr YARBROUGH
v.
STATE of Mississippi.
No. 57866.
Supreme Court of Mississippi.
August 10, 1988.
*660 Mager A. Varnado, Jr., Gulfport, for appellant.
Edwin Lloyd Pittman and Mike Moore, Atty. Gen. by Felicia C. Adams, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before DAN M. LEE, PRATHER and ZUCCARO, JJ.
DAN M. LEE, Presiding Justice, for the Court:
Anthony Yarbrough was indicted by the Grand Jury of Harrison County, Mississippi, on March 28, 1983, for aggravated assault. He was tried before a jury in the Circuit Court of Harrison County, Mississippi, convicted, and sentenced to fifteen (15) years in the custody of the Mississippi Department of Corrections. Yarbrough appeals his conviction and sentence, assigning three errors; we address one and reverse and remand for a new trial.

FACTS
At trial, there were only two witnesses, one for the state and one for the defendant. The state's witness, Michael A. Newman, gave the only testimony as to the facts of the incident. On December 21, 1982, Newman was working for Day Securities as a detective at the Jitney Jungle food store in Gulfport. Around 7:30 p.m., he noticed a black male near the meat counter. Newman became suspicious of this person because he did not look at the product he picked out, but just grabbed up two packages, turned around, and went back up the aisle. Newman followed him up an adjacent aisle to see what he would do. When Newman reached the end of his aisle, which is directly near the checkout, the person was slower getting there than he should have been. When the person reached the check-out aisle, Newman noticed that he did not have any packages of meat, but only a small, plastic, white container with him. The person went through the check-out aisle, paid for the small plastic container, and proceeded toward the door. Newman followed him, approached him, identified himself as store security, and asked him what he had done with the two packages of meat. The man was dressed in a pair of nylon jogging pants, a t-shirt, and a jogging jacket, which was open. When Newman asked him about the meat, the man said he didn't know what he was talking about. Newman then told him that he had seen him pick up two packages of meat from the meat counter and wanted to know where they were. When the man responded that he still did not know what Newman was talking about, Newman asked him to further open up his jacket. When the man opened his jacket, Newman noticed the tops of two styrofoam packages sticking out over the top of his pants. At that point, Newman told the man he was under arrest for shoplifting and would he please step to the side of the aisle. The man replied, "you're not arresting me for anything, ____ ____," while crouching in a football stance and heading for the exit. On his way to the exit, he forearmed Newman in the chest. Newman stepped around and grabbed him by both shoulders from behind, spinning him around and throwing him against the coin-operated video game machines next to one of the check-outs. In the process, both of them fell to the floor. When the man hit the floor, he was face down with his left hand at his side and his right arm above his head with Newman on top of him. Newman grabbed his right hand and pulled it around his back with the intention of handcuffing him. At that moment, the man said he had a gun and he would shoot. Newman, not believing him, said "sure." However, the man's left hand came up holding a blue steel, short-barrelled revolver. Newman relinquished his grip on the man's right hand, using both hands to go for the gun. A struggle ensued *661 during which both men reached their feet again. The man shifted the gun to his right hand, with his index finger through the trigger guard. Newman attempted to break the grip by putting his left hand over the top of the cylinder to keep it from rotating so that the gun would not go off. Newman realized that he had to remove the man from the store because the store was full of patrons. Therefore, with his right hand on the man's shirt collar and his left hand over the gun, Newman shoved him through the doorway. The man stumbled a little and ran into the parking lot. Newman ran in pursuit, approximately 50 feet behind him. At some point, the man turned and fired at Newman, but missed. In the parking lot, Newman reached for his own gun, but realized it was missing, and that the man had taken Newman's gun, a Colt Detective Special, two-inch, blued snubnosed revolver .38 calibre. Newman went to his car to get his backup weapon and ran across the parking lot in pursuit of the man. He lost sight of him somewhere in the neighborhood. Newman returned to his vehicle and drove down one of the streets to the next block, parked the vehicle and proceeded on foot to check the area, but was unable to find the man. The police were summoned to the scene and they conducted a search of the neighborhood, but were unable to find him, either. Newman supplied the police with a description of the man and of his missing gun.
A week or so later, Newman received a phone call from the Biloxi Police Department, Detective Division, requesting that he come to the police station in connection with the incident. At the police station, while walking toward the detective's room, he passed an open door and saw Yarbrough and another black man sitting in that office. He immediately turned around to the three detectives in the reception area, identified himself, and told them that Yarbrough was the man who shot at him in the parking lot of the Jitney Jungle. As a result of this identification, Yarbrough was arrested and removed to the Gulfport jail. Neither the gun nor the bullet was ever retrieved, and no bullet holes were found anywhere around the Jitney Jungle.
The defendant did not testify in his own defense; however, he did call Assistant Chief of Police George Payne of the Gulfport Police Department. His testimony was limited to his employment capacity and verification of a police report prepared by Detective Lieutenant Douglas P. Bridges, which was admitted into evidence by defense counsel.

DISCUSSION
The only proposition we address today is Yarbrough's contention that he was denied effective assistance of counsel at trial in violation of his Sixth Amendment rights under the United States Constitution, and under this contention Yarbrough makes specific allegations of deficient performance which, unfortunately, are substantially borne out by the record. Such deficient performance did not merely prejudice Yarbrough's defense, but in reality amounted to no defense at all being presented on Yarbrough's behalf.
Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), sets out the two-pronged standard which we have adopted, applicable in determining ineffective assistance of counsel issues:
A convicted defendant's claims that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, the trial whose result is reliable. Unless a defendant makes both showings, it cannot be said the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
Id. at 687, 104 S.Ct. at 2064.
Based on the standard articulated in Strickland, this Court has generally not *662 found ineffective assistance of counsel claims to be meritorious, recognizing that such cases are rare. See, e.g., Byrd v. State, 522 So.2d 756, 760 (Miss. 1988); Reynolds v. State, 521 So.2d 914, 918 (Miss. 1988); Carney v. State, 525 So.2d 776 (Miss. 1988); Cabello v. State, 524 So.2d 313 (Miss. 1988); Wiley v. State, 517 So.2d 1373, 1382 (Miss. 1987); Merritt v. State, 517 So.2d 517, 520 (Miss. 1987); Faraga v. State, 514 So.2d 295, 308 (Miss. 1987); King v. State, 503 So.2d 271, 275 (Miss. 1987); Alexander v. State, 503 So.2d 235, 240 (Miss. 1987); Knox v. State, 502 So.2d 672, 676 (Miss. 1987); Odom v. State, 498 So.2d 331, 334 (Miss. 1986); Perkins v. State, 487 So.2d 791, 793 (Miss. 1986); Evans v. State, 485 So.2d 276, 281 (Miss. 1986).
However, in two recent cases, we have reversed and remanded for a new trial based on ineffective assistance of counsel. In Ferguson v. State, 507 So.2d 94 (Miss. 1987), this Court held that the performance of defense counsel was deficient as to his pre-trial investigations because he failed to conduct any independent investigation of the facts and circumstances of the case, relying exclusively on the materials furnished him by the state during discovery, and failed to interview the defendant after the day he was appointed as defendant's counsel. Id. at 96. This Court did not hold that these errors alone prejudiced the outcome of the case; however, Ferguson's counsel denounced him in open court as a liar, and this Court held that such lack of loyalty to his client met the Strickland test for ineffective assistance of counsel. Id. at 97. In Waldrop v. State, 506 So.2d 273 (Miss. 1987), this Court stated that "[t]hough there is a strong but rebuttable presumption that counsel's conduct falls within the wide range of reasonable professional assistance, this Court must determine, based on the totality of the circumstances, whether counsel's efforts were both deficient and prejudicial, thus necessitating a reversal." [cites omitted] Id. at 275. We reversed, holding that defense counsel committed errors "far beyond those of omission" when he introduced evidence that, had the state won its admission over objection, would have required reversal. Id.
Turning to the instant case, we address the first prong of the Strickland test. After a careful reading of the record, it is apparent that no independent investigation of the circumstances of the case was carried out by Yarbrough's trial attorney; counsel relied on whatever materials the state brought to trial. No motions for discovery were filed.
Yarbrough's attorney subpoenaed no witnesses until the day of trial; then, he subpoenaed all the witnesses listed as possible state's witnesses. Having subpoenaed several persons, he called only one witness, a police officer, of whom he asked seven questions and then submitted the police investigative report, signed by this officer, into evidence. It is not clear from the record why he offered this report into evidence since it only reinforced the testimony given by the state's only witness, adversely affecting Yarbrough's defense.
Yarbrough's attorney did not ask for a pre-trial suppression hearing concerning the "show-up" identification of Yarbrough by Newman at the police station. He simply moved to dismiss the indictment, during the middle of the trial, based on violation of his client's constitutional rights, and for failure to provide a proper lineup. By that time, the testimony about the police station identification had already been heard by the jury.
Yarbrough's attorney failed to file jury instructions, the only instruction offered on behalf of the defendant being one by the court on the right of the defendant not to testify.
The record is also replete with instances of counsel's "conduct manifesting ineffectiveness," Waldrop, 506 So.2d at 275, including absurd demands upon the state to produce evidence at trial which should have been available through the discovery process, numerous argumentative outbursts with the bench and refusal to follow rulings and instructions by the court. On several occasions, the attorney expressed his displeasure to the trial judge about *663 having to represent his client. All in all, trial counsel failed to defend his client and may have aided the prosecution by admitting the police investigative report into evidence. Such omissions, errors and unprofessional conduct of trial counsel rise to the level of ineffective assistance contemplated by Strickland, and by no stretch of the imagination constitute legitimate trial strategy. See Waldrop, supra.
As to the second prong of Strickland, we are mindful of the United States Supreme Court's words in Strickland discussing the second prong:
Most important, in adjudicating a claim of actual ineffectiveness of counsel, a court should keep in mind that the principles we have stated do not establish mechanical rules. Although those principles should guide the process of decision, the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.

Strickland, 466 U.S. at 696, 104 S.Ct. at 2069. [emphasis added]
Similarly, in Johnson v. State, 511 So.2d 1333 (Miss. 1987), this Court discussed the standard articulated in Strickland in these words:
Therefore, any court seeking to determine whether the constitutional guarantee has been met, must look at the entire performance of the attorney and determine if the defense attorney was competent and whether he sincerely tried to assist his client... . Unless the mistake or conduct was of such magnitude that the court concludes the lawyer was incompetent or evidenced a failure to conscientiously fulfill his adversarial role, we will conclude the constitutional guarantee for performance of counsel as enunciated in Strickland has been met.
Id. at 1340 (assignment of error denied).
We conclude that Yarbrough's trial attorney failed "to conscientiously fulfill his adversarial role" and we further conclude that the result of this particular proceeding is unreliable because of a breakdown of the adversarial system.
Therefore, we reverse and remand for a new trial.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON and ZUCCARO, JJ., concur.
GRIFFIN, J., not participating.