578 A.2d 734

**Marselle Jerome BOWERS**

v.

**STATE of Maryland.**

**No. 111, Sept. Term, 1989.**

Court of Appeals of Maryland.

Sept. 4, 1990.

Judith R. Catterton (Catterton, Kemp & Mason, Rockville), both on brief, for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore), both on brief, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS * and CHASANOW, JJ.

ADKINS, Judge.

In this case we shall hold that Marselle Jerome Bowers was denied his sixth amendment right to effective assistance of counsel during his 1982 trial for murder. We must, therefore, set aside his conviction.

I.

We sketch the procedural background of the case. On 16 September 1981, Bowers was charged with murder. Following a jury trial in the Circuit Court for Charles County, he was convicted, on 17 September 1982, of premeditated first degree murder. On 23 September 1982, following a capital sentencing proceeding, the same jury sentenced Bowers to death. This Court affirmed the conviction, vacated the sentence, and remanded for a new sentencing proceeding. *Bowers v. State*, 298 Md. 115, 468 A.2d 101 (1983), *cert. denied*, 479 U.S. 890, 107 S.Ct. 292, 93 L.Ed.2d 265 (1986) (*Bowers* I).

---

* Adkins, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Art. IV, § 3A, he also participated in the decision and the adoption of this opinion.

At the new sentencing proceeding, on 25 October 1984, a jury again sentenced Bowers to death. Bowers appealed; this Court affirmed the imposition of the death sentence. *Bowers v. State,* 306 Md. 120, 507 A.2d 1072, *cert. denied,* 479 U.S. 890, 107 S.Ct. 292, 93 L.Ed.2d 265 (1986) *(Bowers II).* Bowers sought post-conviction relief. A post-conviction hearing was held before Judge Robert C. Nalley. On 31 August 1989 Judge Nalley affirmed Bowers's conviction but granted a new sentencing hearing.[1]

Bowers's application for leave to appeal from the post-conviction court's denial of his request that his conviction be set aside came to this Court pursuant to Maryland Rule 8–306(e). We granted it.

## II.

### A.

The events that set in motion the aforegoing nine years of legal combat occurred in the summer of 1981. A brief summary of those events will facilitate an understanding of Bowers's contentions in this case.

On 9 July 1981 Maryland State Police discovered the body of Monica McNamara near a railroad overpass in Somerset County. Her death had been caused by strangulation. She had been raped and sodomized. Her car was found abandoned on a roadside in Worcester County, where it had been observed on the evening of 8 July.

On 31 July the police learned that a man who called himself Robert McNamara had been arrested in Petersburg, Virginia. He had attempted to use Monica McNamara's credit card to pay for accommodations at a Ramada Inn there. When Maryland State Trooper D. Bruce Hornung

---

1. The jury questionnaire employed in this case was the same one with which the Supreme Court of the United States found fault in *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). Judge Nalley correctly noted that in *State v. Colvin,* 314 Md. 1, 548 A.2d 506 (1988), we applied *Mills* retrospectively. Judge Nalley did likewise and vacated Bowers's sentence.

confronted "McNamara" in Petersburg on 1 August, the man admitted his real name was Marselle Jerome Bowers. Later he gave Trooper Hornung a narrative statement in which he said that he and an accomplice, one Alexander Peterson, had abducted Monica McNamara and had intercourse with her, and that Peterson had strangled her. Bowers denied that he had played any part in the killing itself.

Separate cases were brought against Bowers. In the Circuit Court for Worcester County he was charged with kidnapping. That case was removed to Talbot County, where Bowers was convicted and given the maximum sentence. The conviction was affirmed in an unreported decision of the Court of Special Appeals.

In the Circuit Court for Somerset County Bowers was charged with first degree murder—both premeditated murder and felony murder. That case was removed to Charles County. When Bowers raised double jeopardy questions (presumably based on the separate kidnapping prosecution) the State dropped the felony murder charge. Bowers was convicted of premeditated murder and sentenced to death. This is the case reported in *Bowers* I, and is the one now before us.[2]

### B.

As the preceding narrative shows, Bowers's own version of the events of 8 July 1981 involved the contention that he had nothing to do with McNamara's killing. In his statement to Trooper Hornung, Bowers claimed that Bowers had proposed simply trussing up the victim and leaving her by the roadside, but that Peterson had insisted on killing her. Failure to press this theory of defense in a reasonably

---

**2.** These facts are gleaned from our opinion in *State v. Bowers,* 298 Md. 115, 468 A.2d 101 (1983), *cert. denied,* 479 U.S. 890, 107 S.Ct. 292, 93 L.Ed.2d 265 (1986) (*Bowers* I), from the Report of Trial Judge filed in that case, and from the decision of the Court of Special Appeals in *Bowers v. State,* No. 1300, Sept.Term, 1982 (Md.App., filed 12 May 1983) (unreported).

competent manner is the basis for Bowers's first and strongest argument that the assistance of counsel he received was less effective than that permitted by the sixth amendment.

That counsel was Solomon Reddick, a staff attorney in the Public Defender's office. He was assigned to represent Bowers after some preliminary jockeying caused by Bowers's dissatisfaction with an earlier public defender, and despite Bowers's expressed discontent with counsel which continued through much of the case. We shall return to that later. For the present, we note that Reddick, when he undertook representation of Bowers, was assigned to the Public Defender's inmate services unit where he handled post-conviction cases. There is no indication in the record that he had ever defended in a capital case, or even a first-degree murder case. Despite testimony that it was the general policy of the Public Defender to assign two lawyers to every death-penalty case, and despite Reddick's apparent inexperience in this type of case, he was Bowers's only lawyer during most of this case.

We are required to "presum[e] ... that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment...." *State v. Tichnell,* 306 Md. 428, 456, 509 A.2d 1179, 1193, *cert. denied,* 479 U.S. 995, 107 S.Ct. 598, 93 L.Ed.2d 598 (1986). That "presumption is not undermined by the fact that the defendant's lawyer is young or inexperienced." *Harris v. State,* 303 Md. 685, 719, 496 A.2d 1074, 1091 (1985). Nevertheless, "[t]hat a person who happens to be a lawyer is present at trial alongside the accused ... is not enough to satisfy the constitutional command" that there be effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 685, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674, 692 (1984). And in any case, " '[t]he character of a particular lawyer's experience may shed light in an evaluation of his actual performance.' " *Harris,* 303 Md. at 719, 496 A.2d at 1091

(quoting *United States v. Cronic*, 466 U.S. 648, 665, 104 S.Ct. 2039, 2050, 80 L.Ed.2d 657, 672 (1984)).

We shall keep that in mind as we review Bowers's claims.

## C.

The State sought to dispel the notion that Bowers had been accompanied by a companion named Alexander Peterson on 8 July 1981 by presenting evidence that a man named Alexander Peterson had been in prison in another state at the critical time. Thus, it was of great importance to the defense to produce evidence that someone had been with Bowers, as he insisted.

One opportunity to do so came in connection with the testimony of Robert J. Radnoti, a forensic chemist produced by the State. Reddick had learned through discovery that a Negroid hair was found on the victim's head (Peterson was said to be black, as is Bowers). A State Police report stated that hair samples taken from Bowers "were *different* when compared to the Negroid hair strand" found on the victim [emphasis in original]. Radnoti had tested the hairs, but was not asked about them on direct examination.

On cross-examination, Reddick tried to ask the chemist about those hairs. The State objected because the question was beyond the scope of direct. The State's Attorney noted that

if he [Reddick] wants to get this thing in he has an option to call this man [Radnoti] as a witness.... If he wants to bring this man as a witness that is fine. There is a way to do it.

Reddick argued that the laboratory report "is admissible now since we have shown that [Radnoti] has read from part of the report." The court disagreed and sustained the objection. Reddick posed no more questions, but asked that the judge not excuse Radnoti, who was the State's last witness. The judge directed Radnoti to return to the witness room. The State rested. Reddick never called Radnoti and the incompatible hair evidence was never placed before

the jury. Thus, Reddick could not argue that Bowers's contention as to the presence of a companion was supported by evidence other than Bowers's own say-so.

Reddick's other omission relating to the possible presence of Peterson was not as dramatic, but still of some significance. Bowers, it will be recalled, had been arrested by Virginia authorities on a charge of defrauding the innkeeper of a Ramada Inn. Sadie Hood, the general manager of that Inn, testified for the State. She identified Bowers as the guest with whom she had spoken about his bill. When she went to his room (where he was registered as Robert McNamara) she said she "found two gentlemen in the room" one of whom was introduced as McNamara. She identified Bowers as "McNamara." Reddick asked her no questions about the second man—for example, whether he was black, or whether he was introduced as Peterson—so there was nothing specific that the defense could argue in an effort to suggest that man was Peterson.

The question is whether these shortcomings on Reddick's part meet the tests for determining whether counsel's representation is so deficient that it is constitutionally ineffective.

### D.

The tests are set forth in *Strickland v. Washington, supra.* We reviewed and applied them most recently in *State v. Colvin,* 314 Md. 1, 548 A.2d 506 (1988), where Judge Rodowsky, for the Court, noted that they had been "painstakingly analyzed" by Judge Orth in *Harris, supra,* and "distilled" by Chief Judge Murphy in *Tichnell, supra. Colvin,* 314 Md. at 5–6, 548 A.2d at 508. Since *Strickland,* the Supreme Court also has revisited the area. *See Burger v. Kemp,* 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987), and *Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). *See also Perry v. Leeke,* 488 U.S. 272, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989).

In *Harris*, 303 Md. at 694, 496 A.2d at 1078, Judge Orth, for the Court, thoroughly discussed the nature and scope of the sixth amendment right to counsel, applicable to the States through the fourteenth amendment. There is no need to repeat that discussion here. We add only the Supreme Court's explanation of why the right is of such fundamental importance to our system of justice:

a fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding. The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the "ample opportunity to meet the case of the prosecution" to which they are entitled. *Adams v. United States ex rel. McCann*, 317 U.S. 269, 275, 276 [, 63 S.Ct. 236, 240, 87 L.Ed. 268, 273] (1942); see *Powell v. Alabama*, [287 U.S. 45,] 68–69 [, 53 S.Ct. 55, 64, 77 L.Ed. 158, 170–171 (1932)].

*Strickland*, 466 U.S. at 685, 104 S.Ct. at 2063, 80 L.Ed.2d at 692. Thus, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. at 2064, 80 L.Ed.2d at 692–693.

 As we summarized in *Harris*, a defendant who hopes to show that counsel was ineffective in that sense has the burden of persuading a court that:

(1) counsel's performance was deficient, *and*

(2) the deficient performance prejudiced the defense.

*Harris*, 303 Md. at 696, 496 A.2d at 1079 [emphasis in original]. The performance component of this two-pronged test is met if "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.*, 104

S.Ct. at 2065, 80 L.Ed.2d at 694. As to the prejudice component, putting aside those few situations in which prejudice is presumed (actual or constructive denial of counsel and actual conflict of interest), the defendant must show that the particular and unreasonable errors of counsel "actually had an adverse effect on the defense." *Id.* at 693, 104 S.Ct. at 2067, 80 L.Ed.2d at 697.

To show that an error of counsel "actually had an adverse effect on the defense" may seem to be an almost impossibly high requirement. But surely the Supreme Court did not intend a *Strickland* analysis to be a total barrier to relief in ineffective assistance cases. *See Sullivan v. Fairman*, 819 F.2d 1382 (7th Cir.1987). And indeed, the *Strickland* Court's further discussion of the performance standard indicates the "actually had an adverse effect" language is not to be read literally.

■ After stating the "actually had an adverse effect" criterion, the Court went on to explain that it would not be sufficient for the defendant to show merely "that the errors had some conceivable effect on the outcome of the proceedings." 466 U.S. at 693, 104 S.Ct. at 2067, 80 L.Ed.2d at 697. After all, virtually any error could have some *conceivable* effect on the outcome. But "[o]n the other hand, we believe that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.*, 104 S.Ct. at 2068, 80 L.Ed.2d at 697. In other words, the prejudicial effect of counsel's deficient performance need not meet a preponderance of the evidence standard. The Court at one point indicated that the test is whether the trial can be relied on "as having produced a just result." *Id.* at 686, 104 S.Ct. at 2064, 80 L.Ed.2d at 692–693.

In explicating the standard it adopted as the appropriate measure of prejudice, the Court rejected the "high standard for newly discovered evidence claims." *Id.* at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 697. We ourselves have recently had occasion to consider the proper standard to use in cases of

newly discovered evidence, and we came to a conclusion much like the one the Supreme Court reached in *Strickland.*

In *Yorke v. State,* 315 Md. 578, 556 A.2d 230 (1989), we had to decide what degree of impact on the outcome of a trial would justify the granting of a new trial on the ground of material newly discovered evidence. Judge Orth, for the Court, explained that other jurisdictions "apply essentially the 'might' standard or the 'probable' standard," both of which he described as "rather nebulous." 315 Md. at 586, 556 A.2d at 233. After careful review of the various possibilities, we chose "a standard that falls between 'probable,' which is less demanding than 'beyond a reasonable doubt,' and 'might' which is less stringent than probable." *Id.* at 588, 556 A.2d at 234–235. We thought a workable standard was:

> The newly discovered evidence may well have produced a different result, that is, there was a substantial or significant possibility that the verdict of the trier of fact would have been affected.

*Id.,* 556 A.2d at 235.

When we return to *Strickland*'s prejudice prong, we find that many decisions apply the Supreme Court's "reasonable probability" language without any particular attempt to define the term with more precision. *See, e.g., United States v. Cortes,* 895 F.2d 1245 (9th Cir.1990); *Nixon v. Newsome,* 888 F.2d 112 (11th Cir.1989); *Woodard v. Sargent,* 806 F.2d 153 (8th Cir.1986); *Troedel v. Wainwright,* 667 F.Supp. 1456 (S.D.Fla.1986), aff'd *per curiam,* 828 F.2d 670 (11th Cir.1987); *Montgomery v. Peterson,* 664 F.Supp. 398 (C.D.Ill.1987). Sometimes a court seems to apply a more stringent test. *See In re Cordero,* 46 Cal.3d 161, 184, 756 P.2d 1370, 1385, 249 Cal.Rptr. 342, 356 (1988) (*probable* that deficient conduct of counsel produced less favorable result than would otherwise have occurred). Sometimes a much less strict one has been used. *Osborn v. Shillinger,* 861 F.2d 612, 625 (10th Cir.1988) (if counsel's errors "*may* have affected the result, the proceeding,

though formally adversarial, is deemed inadequate to satisfy the Sixth Amendment" [emphasis supplied] ). In *Sullivan, supra,* the court believed the prejudice component was satisfied if the defendant showed that there could have been " 'a reasonable doubt respecting guilt' " had certain witnesses testified. 819 F.2d at 1392 (quoting *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068–2069, 80 L.Ed.2d at 698). At least one court has written that it is sufficient if, had certain psychiatric evidence been produced, "there is a substantial possibility that the State would have been unable to prove [the defendant's] sanity beyond a reasonable doubt." *Galloway v. State,* 698 P.2d 940, 942 (Okla.Crim. App.1985).

"Substantial possibility," of course, is the term we used to define the "may well" standard we adopted in *Yorke.* We think the standard, as so defined, aptly describes the prejudice standard the Supreme Court adopted in *Strickland.* We shall apply it in this case.

### E.

#### 1.

■ With respect to Reddick's failure to introduce evidence that a Negroid hair from a person other than Bowers had been found on Monica McNamara's head, Judge Nalley concluded that Bowers "did not receive reasonably effective assistance of counsel" because that failure "was outside the wide range of reasonably competent legal assistance." We agree.

Bowers, in his statement to Trooper Hornung, claimed that Peterson had been the actual killer of McNamara. The State had put on evidence that a Peterson had been in prison in another state on 8 July 1981. It was of critical importance to the defense that doubt be cast upon this evidence, and the presence of the Negroid hair was a way of doing so, for that would have permitted an argument that the hair did not belong to Bowers, but instead belonged to some other person, and that the other person was Peter-

son. There was no other evidence of that sort in the case. Thus, this case is distinguishable from *Commonwealth v. Lebron*, 23 Mass.App.Ct. 970, 503 N.E.2d 472 (1987). In that rape case, hairs found on a couch in the victim's home were analyzed. Some were consistent with the victim's hair and some were not, but *none* was consistent with the hair of Lebron, whose defense was alibi. Lebron's lawyer did not call as a witness the chemist who had analyzed the hairs. The Massachusetts court declined to find that counsel's performance had been constitutionally deficient, but that was because the hair analysis was already in evidence, the chemist's report having been admitted by agreement. 503 N.E.2d at 474. Thus, it was before the fact finder and available as a basis for argument.

But here Chemist Radnoti's report was never introduced. And despite the suggestion of the State, Reddick's own request that Radnoti not be excused, and the Court's instruction that Radnoti remain available, Reddick never called him. Reddick did not testify at the post-conviction hearing, so we do not have the benefit of any explanation he might have given for this lapse. In this respect the case differs from *Colvin, Tichnell,* and *Harris,* for in each of those matters trial defense counsel did testify at post-conviction. We were thus able in each of those cases to ascribe some reasonable strategic purpose to counsel's actions. We cannot do so here.

The failure to put in the Negroid hair evidence, combined with the failure to examine Ms. Hood, the Ramada Inn Manager, as to, at a minimum, the race of Bowers's companion at that hostelry, violated at least two duties of counsel specifically listed in *Strickland:* the "duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process" and the "overarching duty to advocate the defendant's cause." 466 U.S. at 688, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. *See also Harris,* 303 Md. at 696, 496 A.2d at 1079. Having undertaken an independent constitutional appraisal based on the entire

record, we have no doubt that Reddick's representation of Bowers was not reasonably competent under "prevailing professional norms." *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2065, 80 L.Ed.2d at 688.[3]

### 2.

■ We turn to the prejudice component. Although he found Reddick's performance deficient with respect to the Negroid hair evidence, Judge Nalley held that an insufficient showing of prejudice had been made. The judge was aware of the requirement of Maryland Code (1957, 1987 Repl.Vol., 1989 Cum.Supp.), Article 27, § 413(e)(1) that in general only one who is a principal in the first degree to murder in the first degree (*i.e.* the actual killer) can be given a death sentence. He nevertheless pointed out that the determination of principalship was not a matter for the guilt/innocence phase of the trial, but rather was to be addressed at the sentencing proceeding. Thus, he thought, the failure to bring out the Negroid hair evidence at the guilt/innocence phase of the trial could not be prejudicial. *State v. Colvin, supra,* 314 Md. at 16–19, 548 A.2d at

---

**3.** In passing, we note that in Bowers's statement to Trooper Hornung, Bowers said that he and Peterson had spent time near St. Michaels, Maryland, with "Bunny Guy and his wife." According to Bowers, he and Peterson left the Guys' on the Wednesday prior to the Friday crimes. The record is silent as to whether Reddick investigated this potential additional substantiation of Peterson's presence. Unexplained failure to investigate may be deficient performance. *In re Cordero,* 46 Cal.3d 161, 184, 756 P.2d 1370, 1384, 249 Cal.Rptr. 342, 356 (1988); *People v. Bell,* 152 Ill.App.3d 1007, 1012–1013, 106 Ill.Dec. 59, 63, 505 N.E.2d 365, 369, *leave to appeal denied,* 115 Ill.2d 544, 110 Ill.Dec. 459, 511 N.E.2d 431 (1987); *Troedel v. Wainwright,* 667 F.Supp. 1456 (S.D.Fla.1986), *aff'd (mem.)* sub nom. *Troedel v. Dugger,* 828 F.2d 670 (11th Cir.1987). *Compare Kimmelman v. Morrison,* 477 U.S. 365, 385, 106 S.Ct. 2574, 2588, 91 L.Ed.2d 305, 326 (1986) (defendant's lawyer "neither investigated, nor made a reasonable decision not to investigate") *with Tichnell v. State,* 306 Md. 428, 453–454, 509 A.2d 1179, 1192 (1986) (defense counsel's strategy and information available to him showed that failure to conduct additional investigation was not unreasonable). *See also Harris v. State,* 303 Md. 685, 718–719, 496 A.2d 1074, 1090–1091 (1985).

513–515.[4] Additionally, Judge Nalley believed that because of the felony murder doctrine, *see* Art. 27 §§ 408–410 and, *e.g., Campbell v. State,* 293 Md. 438, 442, 444 A.2d 1034, 1037 (1982), Bowers could have been guilty of first degree murder whether or not he had been the actual killer. This circumstance, of course, was important to our rejection of the ineffective assistance claim in *Colvin,* 314 Md. at 16, 548 A.2d at 513.

Judge Nalley apparently forgot that the State had expressly abandoned its charge of felony murder. Bowers was on trial only for first degree premeditated murder. The jury could have convicted him only if it found beyond a reasonable doubt that he had killed Monica McNamara with a willful, deliberate, and premeditated intent to do so. *See Ross v. State,* 308 Md. 337, 341, 519 A.2d 735, 737 (1987). In *Bowers* I, moreover, we noted that Bowers was not in fact convicted of felony murder. 298 Md. at 143, 468 A.2d at 115. Had the Negroid hair evidence been presented to the jury, it might well have believed that Bowers had a companion on the fatal night. Had it believed that portion of Bowers's statement, it might well have found credible the other portions in which Bowers depicted Peterson as the prime mover of the entire incident and the sole killer of McNamara. Based on those beliefs, it follows naturally that the jury might well have concluded that Bowers had not possessed the requisite *mens rea* for premeditated murder. The jury, therefore, might well have found him to be an accessory to second degree murder, Article 27, § 411, or perhaps guilty of second degree murder. At the very least, the jury might well have harbored reasonable doubt as to the premeditated murder charge.

Reddick's default in effect deprived Bowers of the ability to bolster a potentially viable defense. We believe there is "a probability sufficient to undermine confidence in the

---

4. Since Judge Nalley vacated Bowers's sentence, n. 2, *supra,* he had no occasion to decide whether the failure to present the Negroid hair evidence would have been prejudicial at sentencing. *See Colvin.*

outcome," *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698, that had the Negroid hair evidence been admitted, the outcome might well have been different. *See Sullivan,* 819 F.2d at 1393; *Galloway,* 698 P.2d at 942. Counsel's conduct here "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." 466 U.S. at 686, 104 S.Ct. at 2064, 80 L.Ed.2d at 692–693. Accordingly, the post-conviction court should have set aside Bowers's conviction, as well as his sentence.

### III.

■ Because of what we have just held, it is not essential that we review any of Bowers's other contentions. Nevertheless we shall do so because an alternative ground for our holding is that the cumulative effect of numerous errors on the part of Reddick also deprived Bowers of the effective assistance of counsel.[5]

### A.

Bowers's case was beset with difficulties. The first lawyer who represented him was R. Patrick Hayman, an assistant public defender. On 6 October 1981 Bowers moved to strike Hayman's appearance. At the post-conviction hearing Bowers said he did so because Hayman had not consulted with him and because he was uncomfortable with some plea bargains that Hayman was proposing. The circuit court granted the motion and also Bowers's motion for self-representation. Shortly after that the State served notice of its intention to seek the death penalty, whereupon

---

5. Among the other issues Bowers raises is the proposition that the question of principalship in the first degree should be decided at the guilt/innocence phase of the proceedings, rather than at the sentencing phase. We rejected this argument in *State v. Colvin,* 314 Md. 1, 17–19, 548 A.2d 506, 514–515 (1988), and see no need to revisit it. Additionally, Bowers argues that hybrid representation and disloyalty of his lawyer both operated to deny him effective assistance of counsel. We shall include the circumstances on which these assertions are based in our general review of Reddick's performance.

the circuit court appointed the Public Defender's Office as "standby counsel." It was at that time, December 1981, that Reddick entered the case.

Reddick visited Bowers for the first time on 11 January 1982. The trial date was 20 January. Bowers was effectively denied access to the law library in the penitentiary. He decided to ask Reddick to represent him actively and on 25 January Reddick entered his appearance, the trial having been postponed. Reddick met with Bowers again on 4 February. The meeting apparently was a difficult one, because on 8 February Bowers filed another motion to strike counsel, alleging Reddick's inexperience and his failure to pursue "fruitful issues." The motion was denied.

Possibly unsure as to his precise position in the case, on 13 April Reddick filed what he entitled a "Motion to Determine Whether or Not He Represents the Defendant." In it he claimed, among other things, that Bowers was not cooperative, wished to represent himself, and had accused Reddick of unethical conduct and incompetence. Reddick alleged "[ ] that counsel cannot render effective assistance under present conditions." To the motion Reddick attached correspondence between him and Bowers, apparently intended to illustrate the difficult relationship between counsel and client, but also revealing some information about possible defenses Bowers might assert at trial. At a lengthy hearing on the motion, at which both Reddick and Bowers testified, Reddick observed that he and Bowers "spend more time in court fighting each other than fighting the State's Attorney." The circuit court judge said he could not conclude either that Reddick was incompetent or that he was, as of that date (4 August 1982) providing inadequate representation. Ultimately, the court decided that Reddick would continue to represent Bowers. But the representation was that sort of hybrid representation that we later held to be impermissible. *Parren v. State*, 309 Md. 260, 523 A.2d 597 (1987). At many points in the proceedings, it was not clear just who was in charge of the defense. Sometimes Reddick acted as lawyer. Sometimes, as in the cross-examination of a medical witness, Bowers did.

Moving back in time a bit, it seems that after 4 February, Reddick did not meet again with Bowers until 13 April. He did not prepare Bowers for a 27 August suppression hearing, although he met with his client once between 5 August and 27 August. After the 27 August hearing, Reddick did not again meet with Bowers until the trial began on 15 September. During the trial, according to the post-conviction testimony, Reddick never met with Bowers outside the courtroom. Nor did he confer with his client between the rendition of the guilty verdict and the start of the sentencing hearing, six days later.

In preparation for trial, Reddick failed to investigate plaster casts of tire markings, fibers found under the victim's fingernails, and semen stains found on her underwear. He told Bowers (incorrectly, according to the uncontradicted post-conviction testimony) that funds were not available to pay experts to analyze this forensic evidence.

At a hearing held on a motion to suppress Bowers's statement to Trooper Hornung, Reddick failed to cross-examine the officer about questions the officer had used to elicit information from Bowers after Bowers had asked for a lawyer. At trial, Reddick made no opening statement and put on no defense testimony. His shortcomings as to efforts to substantiate the presence of a companion we already recounted. He failed to impeach one witness with prior inconsistent statement and in another situation allowed the introduction of "other crimes" evidence without objections. Although there was evidence that Bowers had been consuming alcohol and drugs at the time of the attack on McNamara, Reddick did not request an instruction on the effect of intoxication on the ability to form the requisite intent to commit murder in the first degree. His closing argument was cursory.

B.

1.

Bowers, as we have noted, *see* n. 5, *supra,* contends that hybrid representation is itself enough to show inadequate

representation. We need not decide that question. It is enough to note that there were obvious conflicts between him and Reddick, although Reddick did not go quite as far as the lawyer in *White v. White*, 602 F.Supp. 173, 181 (W.D.Mo.1984), who told his client, minutes before trial began, "I don't want to go to trial with you" and "I don't want to represent you." There was less evidence of "irreconcilable conflict" between Bowers and Reddick than there was in *Brown v. Craven*, 424 F.2d 1166 (9th Cir.1970), where, it seems, there was no communication whatsoever between client and lawyer. There were, however, indications of the practical problem we identified with respect to "hybrid" representation; there was no clearly identified captain of the defense ship, *Parren*, 309 Md. at 264, 523 A.2d at 599, and this may well have contributed to some of the other defensive lapses. For example, the letters disclosing some possible confidential defense information (copies of which were sent to the court clerk) were a direct product of the conflicts between Reddick and Bowers. While this information should not have been disclosed, the fact that Reddick revealed it did not amount to the sort of conflict of interest condemned in *Osborn, supra,* where the lawyer turned against the client and publicly chastised him.

### 2.

Reddick's infrequent consultations with Bowers probably also flowed from this difficult relationship. But they also suggest a lack of zealous and loyal representation in this capital case. Failure to investigate the forensic evidence is not what a competent lawyer would do. The same is true of Reddick's neglect to cross-examine Hornung. Available to Reddick were the facts that Bowers had told Hornung that he needed a lawyer and then continued to talk about the events of 8–9 July 1981. The State's successful argument was that this was not a statement produced by custodial questioning and was thus admissible. *See Rodovsky v. State*, 296 Md. 386, 398, 464 A.2d 239, 245 (1983). But there was questioning by Hornung. In the Talbot County kidnap-

ping trial of Bowers (a transcript of which was available to Reddick), Hornung, testifying about the same statement, said that at one point while Bowers was allegedly rambling on, unprompted by the State, Hornung said "Now wait a minute, Marselle [Bowers], back up ... you raped [Monica McNamara], too, didn't you?" And Bowers answered "Yes." This possible violation of the dictates of cases like *State v. Conover*, 312 Md. 33, 35, 537 A.2d 1167, 1168 (1988), and *Rodovsky*, 296 Md. at 399, 464 A.2d at 246, was not even explored by Reddick at the murder trial.

### 3.

The lack of an opening statement, while perhaps not in itself enough to show inadequate performance also must be weighed in the balance in a case in which no defense testimony is offered. The jury here heard the State's opening, the State's evidence, and then nothing from the defense until closing arguments. "Many commentators have stated that the opening statement is the single most important portion of a trial." *People v. Lee*, 185 Ill.App.3d 420, 133 Ill.Dec. 536, 540, 541 N.E.2d 747, 761 (1989). People tend to place a stronger belief in the information that they have heard first, which gives prosecutors an advantage. *Id.* 133 Ill.Dec. at 541, 541 N.E.2d at 762. Reddick, by failing to make an opening statement, did nothing to attempt to reduce the State's advantage.

### 4.

Reddick also failed to request an intent instruction based on Bowers's use of alcohol and drugs at the time of the event which gave rise to this case. Trooper Hornung testified at trial on direct examination that Bowers had told him Bowers was intoxicated when he and Peterson first approached the victim. Trooper Hornung further testified that Bowers has stated that he opened a beer and rolled a marijuana cigarette when Peterson first forced Monica McNamara to have sex. Reddick additionally neglected to mention these statements during his closing argument. The Court in *Chisley v. State*, 202 Md. 87, 95 A.2d 577

(1953), said that voluntary intoxication " 'becomes a material subject of consideration by the jury' " when a statute includes different degrees of murder. *Id.* at 107, 95 A.2d at 586. As in *Chisley,* it was appropriate here for the jury to consider evidence of Bowers's voluntary intoxication. Reddick failed to present such evidence.

We think the numerous lapses we have recounted are sufficient, taken all together, to show inadequate performance. As to prejudice, the assessment is more difficult to make. The prejudicial effect of failure to investigate the forensic evidence, for instance, is something we cannot state with any assurance, because we do not know what the investigation might have revealed. The burden of showing prejudice is on Bowers, although that rule might not be applied too harshly when, as here, some or all of the forensic evidence has been lost or destroyed without fault on the part of Bowers. *See Miller v. Montgomery County,* 64 Md.App. 202, 214, 494 A.2d 761, 768 (1985). Consistent with the test in *Strickland* we can and do say, however, that all of these shortcomings leave us convinced that but for counsel's errors the result of the trial might well have been different.

The post-conviction judge thought otherwise, but his approach was to consider each charge of deficient performance and consequent prejudice, and to decide that no one charge alone was serious enough to meet both *Strickland* tests. That approach was incorrect. It is necessary to look at the trial as a whole. *Strickland,* 466 U.S. at 695–696, 104 S.Ct. at 2069, 80 L.Ed.2d at 698–699; *Harris,* 303 Md. at 701, 496 A.2d at 1082.

Even when individual errors may not be sufficient to cross the threshold, their cumulative effect may be. *People v. Bell,* 152 Ill.App.3d 1007, 1019, 106 Ill.Dec. 59, 69, 505 N.E.2d 365, 374 (1987). *See also People v. Lee,* 185 Ill. App.3d 420, 133 Ill.Dec. 536, 541 N.E.2d 747 (1989) (inexperienced trial counsel did not challenge competence of a witness, failed to investigate witness's criminal history, failed to impeach witness, to cross-examine him properly,

and to give opening statement; representation found constitutionally inadequate) and *Smith v. State,* 547 N.E.2d 817 (Ind.1989) (ineffective assistance where counsel failed to tender jury instructions on alibi defense, failed to impeach key witness's inconsistent testimony, failed to respond to witness's remark about taking polygraph test, and failed to present mitigating evidence in sentencing phase). *And see People v. Cole,* 775 P.2d 551, 555 (Colo.1989) (ineffective assistance where counsel "failed to interview witnesses before trial, did no legal research, and failed to consult experts"); *Yarbrough v. State,* 529 So.2d 659 (Miss.1988) (defense counsel's failure to subpoena witnesses until day of trial, failure to sufficiently question the one witness he did call, failure to request pre-trial suppression and failure to file jury instructions, among other problems, resulted in denial of effective assistance); *People v. Trait,* 139 A.D.2d 937, 527 N.Y.S.2d 920, 921 (N.Y.App.Div.1988) (defense counsel's "ineptly developed" opening statement, inadequate trial preparation, failure to appear in opposition to People's motion, "excessive and purposeless cross-examination," in addition to other factors, deprived defendant of constitutional right to effective assistance); *Doherty v. State,* 781 S.W.2d 439, 442 (Tx.Ct.App.1989) (ineffective assistance where defense counsel "did not consult with appellant's first trial counsel, did not consult with appellant's investigator, did not talk to any of the State's witnesses prior to trial, did not subpoena any witnesses, and failed to investigate another possible suspect, an alibi witness, and fact witnesses").

We hold that the cumulative effect of Reddick's actions and non-actions was enough to establish that his representation of Bowers did not meet constitutional muster.

## IV.

Judge Nalley's action in vacating Bowers's sentence is not before us, and that portion of his judgment will remain undisturbed. For the reasons we have stated, however, we

must reverse his decision upholding Bowers's conviction of first degree premeditated murder.

JUDGMENT OF THE CIRCUIT COURT FOR CHARLES COUNTY AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THAT COURT WITH DIRECTION TO VACATE THE CONVICTION OF MARSELLE BOWERS FOR FIRST DEGREE PREMEDITATED MURDER ON THAT CHARGE AND TO HOLD A NEW TRIAL. COSTS TO BE PAID BY SOMERSET COUNTY.[6]

MURPHY, C.J., and RODOWSKY, J., concur.

MURPHY, Chief Judge.

I adhere to this Court's analysis of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), as set forth in our earlier opinion of *Tichnell v. State,* 306 Md. 428, 509 A.2d 1179, *cert. denied,* 479 U.S. 995, 107 S.Ct. 598, 93 L.Ed.2d 598 (1986). Consequently, I can concur only in the result reached by the Court in this case to afford Bowers a new trial.

RODOWSKY, Judge, concurring.

I join only in Parts I and II of the Court's opinion.

---

6. *See* Maryland Rule 8–607(e)(2).